Roysworth D. GRANT and Willie C. Ellis, on behalf of themselves and all others similarly situated, Plaintiffs–Appellants,

and

Louis Martinez, Plaintiff–Intervenor–Appellant,

v.

BETHLEHEM STEEL CORPORATION, James Deaver, Eugene R. Driggers, and Thomas C. Connolly, individually and as agents of Bethlehem Steel Corporation et al., Defendants–Appellees.

No. 824, Docket 79–7225.

United States Court of Appeals, Second Circuit.

Argued April 2, 1980.

Decided Nov. 26, 1980.

Richard A. Levy, New York City (Lewis M. Steel, Eisner, Levy, Steel & Bellman, P.C., New York City, of counsel), for plaintiffs-appellants.

Wayne Cross, New York City (Ralph L. McAfee, Cravath, Swaine & Moore; Reboul, MacMurray, Hewitt, Maynard & Kristol, New York City, of counsel), for defendants-appellees.

Michael D. Ratner, New York City, for plaintiff-intervenor-appellant.

John S. Martin, Jr., U. S. Atty., for the Southern District of New York, New York City (Barbara L. Schulman, Dennison Young, Jr., Asst. U. S. Attys., New York

City, Drew S. Days, III, Asst. Atty. Gen., Civ. Rights Div., U. S. Dept. of Justice, Washington, D. C., of counsel), for amicus curiae United States.

Leroy D. Clark, Gen. Counsel, Equal Employment Opportunity Commission, Washington, D. C., for amicus curiae Equal Employment Opportunity Commission.

McGuiness & Williams, Washington, D. C. (Robert E. Williams, Douglas S. McDowell, Edward E. Potter, Washington, D. C., of counsel), for amicus curiae Equal Employment Advisory Council.

Before LUMBARD, MANSFIELD and KEARSE, Circuit Judges.

MANSFIELD, Circuit Judge:

Appellants, two black and one dark-skinned Puerto Rican ironworkers, brought this class action against Bethlehem Steel Corporation and three of its supervisory employees in the District Court for the Southern District of New York, alleging that it had discriminated against blacks and Hispanics in its selection of ironwork foremen, thereby violating Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, 42 U.S.C. § 1981 and Executive Order 11246, and as a remedy sought backpay. After a bench trial Judge Whitman Knapp on December 27, 1978, entered a Memorandum and Order dismissing the complaint. We reverse and remand for further proceedings. Contrary to the conclusions reached by the district court, appellants made out a prima facie case of both discriminatory treatment, see *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1972), and discriminatory impact from a facially neutral selection procedure, see *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1970); *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 349, 97 S.Ct. 1843, 1861, 52 L.Ed.2d 396 (1977).

1. During the period from 1973 to 1976, 11.8% of Bethlehem's ironworker force was black or Puerto Rican.

Bethlehem Steel Corporation's Fabricating Steel Construction Division (Bethlehem), until it ceased operations in March 1976, was engaged in construction of steel framework for bridges, skyscrapers, hospitals, air terminals and other structures. For this work, which is hazardous, it employed ironworkers who performed jobs ranging from such unskilled tasks as carrying planks to be laid down for flooring, to the more skilled operations of welding or bolting up steel structures. The ironworkers worked together in groups or "gangs" of three to six, each under the leadership of a foreman or "pusher." No special education or training was required for the job of ironworker. To become a foreman, however, an ironworker, because of the dangerous nature of the work, should possess safety consciousness, leadership qualities and productiveness.

As the district court found, "[p]rior to the enactment of Title VII there had been a long history of discrimination against blacks in the hiring of ironworkers in the New York Metropolitan area." In the late 1960's, as a result of a building boom which led to a shortage of ironworkers, and a certain amount of community pressure, blacks were admitted into the ironworker trade, working on permits issued by the union. Until 1970, however, blacks were underrepresented in the trade. During the period from 1970 to 1975, which is a crucial time-frame for purposes of this appeal, blacks filled approximately 10% of the 1,018 ironworker jobs on 10 representative Bethlehem projects.[1] During this same period approximately 126 ironworkers, of whom 97 had had prior experience as Bethlehem foremen, were appointed foremen on the 10 projects. Of these only one was black (Nolan Herrera).

The method used for selection of foremen on Bethlehem's steel projects was at best rather haphazard. On each steel construction project Bethlehem employed a project superintendent who chose the foreman for

the project. The superintendents, all of whom were white, were given uncontrolled discretion to hire whom they pleased. As the district court found, "It is not disputed that the superintendents hired by word of mouth on the basis of wholly subjective criteria." No foremen's jobs were posted and no list of eligible foremen was kept. Instead, upon hearing informally of an upcoming Bethlehem project, of which the superintendent would learn as much as eight months to a year in advance, he would communicate with persons whom he knew in the trade or who were recommended to him by others and line them up as prospective foremen for the project. Under this practice of pre–job hiring those interested in the job of foreman would rarely have the chance to apply for the job on any given project, since only persons solicited by the superintendent would know of the project in advance. By the time the project became known generally and notice of it was posted in the union hiring hall, there would usually no longer be any openings available for the job of foreman.

By the early 1970's the three appellants had all had extensive ironworker experience. Martinez, a 53–year–old dark–skinned Puerto Rican, started as a permit-man, became a union member in 1969 and had worked as foreman on projects for other companies. In 1969 he became a foreman on a large Bethlehem project (Astor Plaza), where he earned an excellent reputation, despite which he was never again chosen as a foreman. Grant, a 51–year–old black, had been an ironworker since age 14, had mastered almost every aspect of the trade, had served as a supervisor on many jobs in Trinidad, and had worked on many structural steel jobs in New York, including the World Trade Center and the Celanese Corporation building. For 10 years he had worked as an ironworker for Bethlehem. Ellis, a black American in his 40's, likewise had wide ironwork experience, engaging in such skilled operations as bolting, fabricating and welding. He had served as a foreman for Harris Structural Steel Corporation and Koch Construction Company before going to work for Bethlehem.

Despite their qualifications and their repeated requests to Bethlehem for assignment to the position of foreman, none of the appellants was ever appointed to that job. Their efforts were frustrated principally by two Bethlehem project superintendents, James Deaver and Eugene Driggers, who were responsible for hiring most foremen on 10 representative Bethlehem projects in the New York Metropolitan area. Deaver, who was a superintendent on many Bethlehem projects for 14 years prior to 1976, never appointed a black or Puerto Rican. His practice was to appoint white foremen by word of mouth from among friends and those recommended by other foremen, union officials or superintendents. His attitude toward appointment of blacks as foremen was summarized by Judge Knapp, "There is no question in my mind . . . that a black man had a much higher threshold of acceptability than a caucasian in Mr. Deaver's mind." Similarly Driggers, who had been a Bethlehem superintendent for many years on some 35 projects, 90% of which were in the New York Metropolitan area, had never appointed a black or Puerto Rican. He likewise appointed white foremen by word of mouth from among friends or persons known to him or those referred to him by others. Although he conceded that some minority ironworkers, including Martinez, had performed satisfactorily and were capable of being foreman, he excused his failure to make appointments of blacks or Puerto Ricans on the grounds that he "didn't know any" and that "nobody [had] ever worked with me to become one." Neither Deaver nor Driggers ever kept any lists of ironworkers qualified to become foreman.

Superintendents Deaver and Driggers defended their subjective hiring practices by pointing to the dangerousness of ironwork and asserting that no objective method of evaluation would have let them effectively determine individuals' competence to handle the heavy responsibility of foremanship. In selecting foremen they tended to call back men who had worked before as Bethlehem foremen; since ironwork is project–

oriented, with laborers and foremen from a completed project returning to the same pool until opportunities at a new project became available, superintendents frequently had ready access to experienced Bethlehem foremen from within the ironworkers' ranks. Of the 126 foreman positions at issue here, 97 went to men who had worked as foremen on previous Bethlehem projects. Several of the remaining hirees had worked as foremen for other ironwork companies. Others had served as ironworkers at Bethlehem before becoming foremen.

Appellants attack the superintendents' word–of–mouth hiring system as discriminatory in both treatment and impact. They assert that friendship and nepotism rather than assessment of ability formed the basis for the superintendents' selections, and that since blacks tended to be excluded from the all–white superintendents' friendship, they were also unlawfully excluded from jobs as foremen. In support of these allegations, appellants point out that the supervisors often went to considerable length to solicit people whom they knew for foreman positions, sometimes calling them on the phone or personally going to ask them to work. One superintendent, Driggers, hired his two sons as foremen, notwithstanding that they had less ironwork experience than the three named plaintiffs and had not served as foremen before. On another occasion, Superintendent Deaver hired a foreman whom he knew had a drinking problem. One member of the gang which this man supervised suffered a fatal accident because he was not following safety regulations. Similarly, Deaver rehired a foreman who had lost a gang member on his last project when a column for which he was responsible fell; the same foreman lost a derrick on the new project, and left work with a nervous breakdown. Appellants urge that concern for workers' safety could not have been the primary motive behind these hirings.

Appellants further assert that the subjective word–of–mouth hiring was unnecessary. They observed that Bethlehem recognized the feasibility of an objective system for hiring of foremen when, in bidding on government contracts, it represented that it would conform to the Equal Employment Opportunity Commission's hiring guidelines, incorporating into these contracts a manual called "A Guide to Equal Employment Opportunity," which Bethlehem Steel had prepared and published for the guidance of its hiring authorities. That manual mandated selection by merit and assurance that qualified minority employees in each unit would have a full opportunity to hear about and compete for available jobs. It required that (1) a job analysis be made to determine the qualifications for each supervisory position, (2) a list of employees in each unit be maintained with each employee's race and position identified, and (3) job notices be posted at each operation and a current list of available vacancies be kept. Although there is evidence that Bethlehem incorporated the Guide selectively in certain contracts, it is unclear whether it actually complied with its requirements in its performance of those contracts.

The district court held that plaintiffs had failed to make out a prima facie case of either discriminatory impact or discriminatory treatment. It took the view that foremen must necessarily be hired according to the superintendents' subjective evaluations of their ability to promote safety and productive work, since there were no readily identifiable objective criteria for determining who would be capable of undertaking such a responsibility. Judge Knapp declined to hold that either Deaver or Driggers had intentionally discriminated against any of the appellants.

The district court also rejected plaintiffs' statistical evidence of discriminatory impact attributed to defendants' hiring practices, which was based on Bethlehem's hiring of only one black in its recruitment of some 126 foremen during the period 1970–75. He held that the underlying assumption, that the percentage of black ironworkers qualified to become foremen was the same as that of whites, was erroneous because blacks had been substantially excluded from the ironwork trade during the 1960's with the result that the percentage of whites

who were experienced and qualified to become foremen was greater than the percentage of blacks. He also held that when presenting their statistical case plaintiffs should not have considered foreman positions that had been offered to men with previous experience as Bethlehem foremen. Such rehiring, he believed, constituted a legitimate neutral business practice, considering the importance of experience as a factor for protection of laborers' safety. Therefore, in his view, the relevant statistic was not one black in 126 foreman selections, but one black in 29 selections of foremen without prior Bethlehem foreman experience. He held that this statistic did not establish a prima facie case, since the hiring of only one more black would have significantly changed the balance in such a small sample.

Having rejected plaintiffs' statistical proof of discriminatory impact resulting from a facially neutral hiring practice, Judge Knapp concluded that plaintiffs had also failed to make out a case of discriminatory treatment under the formula laid down in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and repeated many times thereafter, see *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). He found two central difficulties with this portion of their case. First, since plaintiffs had not adduced the testimony of any blacks other than themselves who had applied for foreman jobs and been passed over in favor of whites, he refused to infer from the depositions of Deaver and Driggers that other blacks besides the plaintiffs had been passed over after applying. Second, he found that the three named plaintiffs had failed to establish all of the elements of a prima facie case of discriminatory treatment as described in *McDonnell Douglas v. Green, supra*, where the Supreme Court held that in order to establish a prima facie case a plaintiff must prove

(i) that he belongs to a racial minority;
(ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications."

Judge Knapp asserted that, since plaintiffs' applications were almost all made after the superintendents had already hired a full complement of foremen for the projects on which they wished to work, plaintiffs had failed to show that they had applied for a job for which Bethlehem was seeking applicants, or that it had continued to seek applicants after rejecting them.

With respect to one instance where Driggers had hired a foreman after one of the plaintiffs had applied for the same job, Judge Knapp stated that he did not believe that Driggers remembered the prior application when hiring the new man. Though Judge Knapp admitted that "if Bethlehem's heart had been in the right place they might have thought of Martinez and sought him out in order to make him a foreman," he declined to find any legal mandate for Bethlehem to do so. Relying on *Furnco Construction Co. v. Waters, supra*, he stated: "Title VII does not obligate an employer to maximize the employment of blacks, but allows a finding of liability only upon a showing that its practices discriminated against them."

## DISCUSSION

Appellants contend that the district court committed various errors in holding that they had failed to make out a prima facie case of discriminatory treatment and discriminatory impact under Title VII of the 1964 Civil Rights Act. Consideration of their claims requires a brief review of governing principles.

As the Supreme Court pointed out in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335–36 n.15, 97 S.Ct. 1843, 1854 n.15, 52 L.Ed.2d 396 (1977), discriminatory or disparate treatment in violation of Title VII occurs where

"[t]he employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." "Disparate impact," on the other hand, results from the use of "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Id.*, 431 U.S. at 336 n.15, 97 S.Ct. at 1854 n.15. Proof of motive is not required to sustain a claim of disparate impact.

■ In order to make out a prima facie case of discriminatory treatment a plaintiff must ordinarily meet the four requirements established by the Court in *McDonnell Douglas*, which are set forth above. Such conduct "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors. See *Teamsters v. United States, supra*, at 358, n.44 [97 S.Ct. at 1866]." *Furnco Construction Corp. v. Waters, supra*, 438 U.S. at 577, 98 S.Ct. at 2949. The four *McDonnell Douglas* requirements, however, do not represent the exclusive method of showing disparate treatment under Title VII. They are "not necessarily applicable in every respect to differing factual situations," *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802 n.13, 93 S.Ct. at 1824 n.13. As the Court pointed out in *Teamsters v. United States, supra*, 431 U.S. at 358, 97 S.Ct. at 1866:

> "The company and union seize upon the *McDonnell Douglas* pattern as the *only* means of establishing a prima facie case of individual discrimination. Our decision in that case, however, did not purport to create an inflexible formulation.... The importance of *McDonnell Douglas* lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act."

Since "[t]he method suggested in *McDonnell Douglas* is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the question of discrimination," *Furnco Construction Co. v. Waters, supra*, 438 U.S. at 577, 98 S.Ct. at 2949, a court need not adhere stubbornly to that case's specific formulae when common sense dictates the same result on the basis of alternative formulae. See *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1014 (1st Cir. 1979).

■ Once a plaintiff has made out a prima facie case of disparate treatment, the burden shifts to the employer to go forward with evidence of "some legitimate, nondiscriminatory reason for the employee's rejection," *McDonnell Douglas Corp. v. Green, supra*, 411 U.S. at 801, 93 S.Ct. at 1823; see *Board of Trustees v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978). An employer-union agreement permitting the employer to discriminate is no defense. "Rights established under Title VII ... are 'not rights which can be bargained away—either by a union, by an employer, or by both acting in concert,'" *Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 447 (D.C. Cir.1976), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1977) (quoting from *Robinson v. Lorillard Corp.*, 444 F.2d 791, 799 (4th Cir.), *cert. denied*, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971)). Where the employer comes forward with evidence of a legitimate reason, the complainant must then be afforded the opportunity, by way of rebuttal,

> "to demonstrate by competent evidence that the presumptively valid reasons for his rejection were in fact a coverup for a racially discriminatory decision." *McDonnell Douglas, supra*, at 805, 93 S.Ct. at 1825.

If the plaintiff shows that the employer's stated reason for rejecting him was a pretext, such as where the reason was not used to reject white applicants, the employer's

reason will not stand. *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978).

A prima facie case of discriminatory impact may be established by showing that an employer's facially neutral practice has a disparate impact on the plaintiff's racial group.

"The objective of Congress in the enactment of Title VII is plain from the language of the statute. It was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees. Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." *Griggs v. Duke Power Co.*, 401 U.S. 424, 429–30, 91 S.Ct. 849, 852–53, 28 L.Ed.2d 158 (1970).

Such a discriminatory racial impact is frequently evidenced by statistics demonstrating that the employer's selection methods or employment criteria result in employment of a disproportionately larger share of whites than of blacks out of a pool of qualified candidates. *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15, 339, 97 S.Ct. 1843, 1854 n.15, 1856, 52 L.Ed.2d 396 (1977); *Hazelwood School Dist. v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977).

■ Against the inference of discrimination that may be drawn from disparate impact attributable to an employment practice, the employer may defend by showing a "business necessity" for the practice, i. e., that it is not based on race but on a "genuine business need" and has "a manifest relationship to the employment in question," or "a demonstrable relationship to successful performance of the jobs for which [the practice is] used," *Griggs v. Duke Power Co., supra*, 401 U.S. 424 at 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158. The employer's burden of proving job–relatedness to rebut a claim of disparate impact is greater than its burden of merely showing a legitimate, non-

discriminatory reason in response to a claim of discriminatory treatment. The hard, cold statistical record of impact provides a stronger circumstantial case of discrimination than a subjective claim of improper motivation. Despite evidence of some weaknesses in the statistics, where they disclose a glaring absence of minority representation in the jobs at issue, the burden on the employer increases since "fine tuning" of the statistics will not rebut an inference of discrimination derived "not from a misuse of statistics but from 'the inexorable zero.'" *Teamsters v. United States, supra*, 431 U.S. at 342 n.23, 97 S.Ct. at 1858 n.23.

■ Should the employer adduce evidence of business necessity the plaintiff must then be given an opportunity to show "that other selection devices without a similar discriminatory effect would also serve the employer's legitimate interest in 'efficient and trustworthy workmanship.'" *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975) (quoting from *McDonnell Douglas Corp. v. Green, supra*, 411 U.S. 792, 801, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668); see also *Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977). "If the legitimate ends of safety and efficiency can be served by a reasonably available alternative system with less discriminatory effects, then the present policies may not be continued," *United States v. Bethlehem Steel Corp.*, 446 F.2d 652, 662 (2d Cir. 1971); *Parson v. Kaiser Aluminum & Chemical Corp.*, 575 F.2d 1374, 1389 (5th Cir. 1978), cert. denied, 441 U.S. 968, 99 S.Ct. 2417, 60 L.Ed.2d 1073 (1979).

If a plaintiff succeeds in establishing the defendant's liability, the question of who is entitled to relief then arises. This question is easily resolved when named plaintiffs prove that they have been treated discriminatorily; each plaintiff who can prove individual discriminatory treatment is entitled to relief. The question becomes more complicated, however, when a class of plaintiffs prove that they were subject to a statutorily proscribed "pattern or practice" of discrimination, see 42 U.S.C. § 2000e–6(a), or

some other form of improper practices resulting in disparate impact. In *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1975), the Supreme Court held that proof of a discriminatory pattern and practice may justify a reasonable inference that each individual hiring decision was made in pursuit of the discriminatory policy, and thereby placed upon the employer the burden to come forward with evidence dispelling that inference, stating:

> "[P]etitioners here have carried their burden of demonstrating the existence of a discriminatory hiring pattern and practice by the respondents and, therefore, the burden will be upon respondents to prove that individuals who reapply were not in fact victims of previous hiring discrimination." *Id.* at 772, 96 S.Ct. at 1267.

See *Teamsters v. United States, supra,* 431 U.S. at 359, 97 S.Ct. at 1866.

Moreover, a victim of a discriminatory practice need not always show that his application was rejected in order to recover.

> "Measured against these standards the company's assertion that a person who has not actually applied for a job can *never* be awarded seniority relief cannot prevail. The effects of and the injuries suffered from discriminatory employment practices are not always confined to those who were expressly denied a requested employment opportunity. A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection." *Teamsters v. United States, supra,* 431 U.S. at 365, 97 S.Ct. at 1869.

Denial of relief under Title VII on the ground that the claimant did not formally apply for the job sometimes "could exclude from the Act's coverage the victims of the most entrenched forms of discrimination," *id.,* at 367, 97 S.Ct. at 1870. Where a discriminatory practice is established, the non-applicant may, in lieu of an application, show that he was within the class of victims who were the subject of unlawful discrimination and that an application would be fruitless, since it would be denied. The law does not require him to do a useless act in order to recover.

Applying these principles to the present case, we recognize that subjective word-of-mouth hiring methods, although suspect because of their propensity for "masking racial bias," *Barnett v. W.T. Grant Co.,* 518 F.2d 543, 550 (4th Cir. 1975), may be upheld despite apparent favoritism of whites over blacks sufficient to constitute a prima facie case, but only where they are necessary to insure that the safest and most competent workmen are hired. *Furnco Construction Corp. v. Waters, supra.*

At the outset, we find insufficient the district court's grounds for holding that plaintiffs failed to make out a prima facie *McDonnell Douglas* case of discriminatory treatment. Each of the appellants was concededly qualified to serve as a foreman (except that Grant could not supervise a "raising" gang). Each unquestionably applied for the position of foreman and was rejected or deferred. The main source of contention is whether they applied for jobs that were available. Examination of the defendants' claims in this respect leads us to conclude that the jobs must be viewed as having been open.

With respect to Ellis' application to Superintendent Pistillo for a job as foreman at the Columbia–Presbyterian Hospital construction, which was then open, the court held that the Superintendent was justified in giving the job to another because "he was motivated by a desire to keep peace with the union" rather than by racial considerations. However, union pressure on an employer does not relieve the latter of its obligation to respect an applicant's Title VII rights, see *Laffey v. Northwest Airlines, supra.*

Similarly the rejection by Superintendents Deaver and Driggers of applications by all three appellants for foremen's jobs was excused on the ground that the superintendents already had filled the foremen's vacancies for the projects in question and had no current openings available. In addi-

tion, the appointment of a white ironworker (Del Duca), who was less qualified than appellants, to a welding foreman's position on a job where Grant was then employed, was justified on the ground that five months had elapsed since appellants had applied and Driggers could not be expected to remember the applications. These lame excuses, in view of other undisputed circumstances, are inadequate to establish that jobs were not available for the plaintiffs. The record is replete with examples of the superintendents' efforts to hire whites who had never applied to be foremen. Rejection of appellants' claims because they failed to apply often enough or at the correct times makes little sense here, in view of the supervisors' admitted practice of hiring foremen before openings formally became available and were announced, which rendered futile the making of applications for foremen's jobs on specific projects. Each of the three named appellants clearly and repeatedly made his interest in a job as foreman known to at least one of the superintendents. This was sufficient to put the superintendents on notice that these men wanted a foreman's job. Under Title VII "a nonapplicant can be a victim of unlawful discrimination ... when an application would have been a useless act serving only to confirm a discriminatee's knowledge that the job he wanted was unavailable to him." *Int'l Brotherhood of Teamsters v. United States, supra,* 431 U.S. at 367, 97 S.Ct. at 1870; *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). Faced with an admittedly entrenched discriminatory system that had historically shown no inclination to make blacks foremen, appellants were not required to keep beating their heads against the wall by reapplying.

The Supreme Court's holding in *Furnco Construction Co. v. Waters, supra,* does not dictate a different result. There the Court held that employers had a responsibility only to offer blacks the same employment opportunities as whites, not to solicit blacks or otherwise devise hiring methods that would maximize black employment. Here blacks were not offered the same employment opportunities as whites. The district

court stated that "if Bethlehem had taken affirmative steps to find qualified blacks, one or more additional black foremen would have been appointed," but concluded that Bethlehem's failure to take such steps could not be illegal, given the logic of *Furnco.* Contrary to the district court's conclusion, we believe that the failure to solicit qualified blacks as foremen constitutes a form of unacceptable discrimination in this case, since whites were here being solicited at the same time, even though the whites made no applications for the foreman's jobs for which they were hired.

The failure of Deaver, Driggers or any other Bethlehem superintendent to give a foreman's job to any of the appellants must also be viewed against (1) Bethlehem's "long history of discrimination against blacks in the hiring of ironworkers in the New York metropolitan area," (2) Judge Knapp's statement that in Mr. Deaver's mind "a black man had a much higher threshold of acceptability than a caucasian," and (3) the fact that although there were 102 blacks in Bethlehem's ironworker force at the time when 126 foremen were selected (almost entirely by Deaver and Driggers), only one black (Herrera) was chosen as a foreman and then only after community pressure. Under these circumstances we must conclude that appellants below made out a strong prima facie case of discriminatory treatment in violation of Title VII. To the extent that Judge Knapp's findings of fact are contrary to this opinion, we hold that they are clearly erroneous. *Dayton Bd. of Ed. v. Brinkman,* 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979).

■ Nor can we accept the district court's conclusion that appellants failed to make out a prima facie case of discriminatory impact under Title VII. The undisputed statistics point strongly toward discrimination. After a "long history of discrimination against blacks in the hiring of ironworkers" Bethlehem during the 1970–75 period employed 1,018 ironworkers, of whom 102 were black or Puerto Rican. During the same period it appointed 126 whites as foremen and only 1 black. Aside from the

three appellants, who were qualified for foremen's jobs, Superintendents Deaver and Driggers testified at trial that they had supervised blacks whom they considered sufficiently competent to be foremen. Yet the district court rejected appellants' statistical case on the ground that foremen's positions filled with whites who had had prior experience as Bethlehem foremen (some 97) should not be counted but indeed should be deducted from the 126 foremen appointed in calculating available foremen's jobs, leaving only 29 openings for persons with no prior experience as Bethlehem foremen. We believe this was error.

This ruling violates the principle stated by the Supreme Court in *Griggs, supra*, 401 U.S. at 430, 91 S.Ct. at 853, that "[u]nder [Title VII], practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." Here, it is indisputable that allowance of hiring based solely on foreman experience would have operated to freeze the effects of past discriminatory hiring practices. In 1972, Judge Gurfein found that unions involved in the metropolitan New York structural steel industry had illegally discriminated against blacks, and ordered them to increase their non–white membership immediately. *United States v. Local 638 . . . and Local 40*, 347 F.Supp. 169, 182 (S.D.N.Y. 1972). Many of the men whom the superintendents hired as foremen were first hired as foremen from the union during the 1960's, when blacks were effectively excluded from competing with them for these positions, and when the entire industry was rife with entrenched discrimination, see *United Steelworkers of America v. Weber*, 443 U.S. 193, 198 n.1, 99 S.Ct. 2721, 2725 n.1, 61 L.Ed.2d 480 (1979). By treating as unassailable these whites' right to rehiring ahead of any black without foreman experience, the district court's narrowing of appellants' statistical case would allow Bethlehem to perpetuate impermissibly the results of its earlier discrimination.

Moreover, the district court's ruling runs counter to the principle that a prima facie case may be made by showing that blacks are concentrated in the "lower paying, less desirable jobs . . . and were therefore discriminated against with respect to promotions and transfers." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 329, 337–38, 97 S.Ct. 1843, 1851, 1855, 52 L.Ed.2d 396 (1977). To the extent that Bethlehem superintendents may have been justified in selecting foremen from the ranks of Bethlehem employees having experience in that job, this represents a defense based on business necessity, not a basis for eliminating such employees from a statistical comparison used to make out a prima facie case.

Prior foreman experience is a factor properly considered in weighing the defense of business necessity. But without an inquiry into the nature and extent of the experience insofar as it may indicate superior competence on the part of the ironworkers, it cannot be categorized as a *sine qua non* for appointment as foremen. An incompetent foreman should not be repeatedly hired over a qualified ironworker without foreman experience merely because the former had the good fortune to have been hired once as a foreman. Here, appellants produced creditable evidence that the superintendents selected some foremen on the basis of friendship without knowledge of or inquiry into their prior safety history. Some of these foremen, as noted above, possessed bad safety records that would have excluded them from rehiring in a strictly merit–based hiring system. No business necessity dictated that these men be rehired without superintendents' assuming any responsibility to consider qualified blacks for the job.

The record, moreover, shows that fully 50% of the foremen hired on the 10 sample projects had worked for Bethlehem less than a year before being made foremen. Each of the named plaintiffs, who were qualified to be foremen, had longer Bethlehem tenure. Many of these other foremen did not have the extensive experience gained by appellants as ironworkers and

foremen in outstanding companies other than Bethlehem. Appellants adduced evidence that Bethlehem supervisors hired their sons, friends, and persons whom they trusted, often despite these men's relatively slight experience as Bethlehem ironworkers, even though persons with Bethlehem foreman experience (including appellant Martinez) were available for the job. Given this fact, we cannot accept the view that the positions for which prior foremen were hired should have been excluded as part of appellants' statistical case on the ground that safety dictated as a matter of business necessity that experienced foremen be rehired. Appellees cannot in one breath maintain that these positions should not be considered as part of appellants' statistical case because the rehiring of experienced foremen is so fundamentally necessary, and in the next breath assert that they acted reasonably in hiring friends and relatives with comparatively little experience ahead of experienced foremen like Martinez, on the basis of subjective judgments of the new candidates' competence. If these positions were open to qualified whites without foreman experience, they should also have been open to qualified blacks.

Appellees' second objection to appellants' statistical case, which was accepted by Judge Knapp, is that it was incorrect to view the entire Bethlehem ironworker force as the pool of qualified candidates for foreman positions. The presence of 10% blacks in the ironworkers' labor force, the argument goes, does not suggest that 10% participation in the foreman ranks should follow. Before 1972 there were few minority workers in the union, and most blacks who belonged to the union in 1975 had been members a relatively short time. Those blacks who belonged to the workforce during the early 1970's took up a comparatively larger segment of the apprentice and trainee pools. The legacy of admitted past dis-

crimination gave blacks less average experience per man than whites. The ratio of qualified blacks to qualified whites in the workforce, appellees conclude, was therefore substantially smaller than the overall percentage of blacks in the workforce.

This background, though partially true, does not justify the assumption that there were *no* appreciable blacks in the workforce with the ability to be good foremen. Though the union had few black members in the early 1970's, many black "permit" workers were working on iron work projects during that period, and some even earlier. See *United States v. Local 638 . . . and Local 40, supra*.[2] Some black workers, including the three named plaintiffs, had more experience at Bethlehem and elsewhere than at least several of the whites hired as foremen. Moreover, as all parties have recognized, experience is only one of several factors to be considered when selecting foremen. It defies common sense to suggest that only one black was sufficiently experienced and competent to merit selection as a foreman during this period when 126 foreman jobs were filled. It would not have created any substantial difficulty for supervisors to maintain a pool of "eligibles" to be notified of foreman openings, from whom they would choose the foremen for new projects. Such a pool would undoubtedly have contained some qualified blacks. Along these lines Bethlehem incorporated its self-generated "Guide to Equal Employment Opportunity" in contracts for federally funded projects, thus demonstrating its belief that a non-discriminatory hiring procedure other than by the subjective word-of-mouth method was feasible. Had it followed the Guide in practice, an equal opportunity would have been afforded to blacks and Puerto Ricans to become foremen. It could just as easily have given adequate opportunity to blacks in its privately funded projects.

---

**2.** Ironworkers did not have to belong to unions. They could obtain permits to work on specific projects, and were allowed access to union halls to determine what jobs were available. Martinez, for example, was a permit worker before joining the union. These permit workers of course did not enjoy the coveted privileg-

es of union membership. Judge Gurfein's opinion in *United States v. Local 638 . . . and Local 40, supra*, recognized that blacks belonged to the ranks of permit workers in significant numbers, but found that the union was discriminating against blacks in its selection of full-fledged members.

For all of these reasons we hold that appellants have made out a prima facie case of not only discriminatory treatment but discriminatory impact as well. We remand the case to permit appellees to introduce additional evidence that their discriminatory conduct may have been justified by business necessity, and for any rebuttal testimony by the plaintiffs. As the evidence thus far introduced is insufficient to meet the burden on the defendants, if no additional defensive evidence is offered the sole remaining issue would be backpay damages.[3]

The order is reversed and the case remanded for further proceedings consistent with the foregoing.

**3.** We do not view our decision in *EEOC v. Enterprise Assn. Steamfitters*, 542 F.2d 579, 588 (2d Cir.), *cert. denied*, 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1976), as barring an award of backpay damages to ironworkers who (unlike the named appellants) did not apply for positions as foremen. However, they would first be required to prove that they were fully qualified to be foremen, and that they failed to apply because it would have been futile to do so. The situation confronted in *Enterprise Assn. Steamfitters* is clearly distinguishable, involving the speculative hypothesis that wholly unqualified applicants for a union apprenticeship program *might* have passed a non–discriminatory test for admission, *might* have progressed satisfactorily through a three to four year program to graduation, and *might* then have succeeded in obtaining employment as steamfitters. No such situation exists here, where even Superintendents Deaver and Driggers testified that some minority ironworkers under their supervision had performed satisfactorily and were capable of becoming foremen.