107 F.3d 2
 NOTICE: THIS SUMMARY ORDER MAY NOT BE CITED AS PRECEDENTIAL AUTHORITY, BUT MAY BE CALLED TO THE ATTENTION OF THE COURT IN A SUBSEQUENT STAGE OF THIS CASE, IN A RELATED CASE, OR IN ANY CASE FOR PURPOSES OF COLLATERAL ESTOPPEL OR RES JUDICATA. SEE SECOND CIRCUIT RULE 0.23.
Diane CALABRITTO, Plaintiff-Appellant,
v.
NASSAU COUNTY DISTRICT ATTORNEY DENIS DILLON, Defendant-Appellee.
 No. 96-7526.
 United States Court of Appeals, Second Circuit.
 Feb. 21, 1997.
 
 Plaintiff Diane Calabritto appeals from a judgment for the defendant Denis Dillon, District Attorney ("DA") for Nassau County, on her Title VII claim. The judgment was entered on April 2, 1996, after a bench trial in the United States District Court for the Eastern District of New York (Spatt, J.).
 
 
 1
 Louis D. Stober, GABA & STOBER, MINEOLA, NY
 
 
 2
 Peter A. Bee, BEE, EISMAN & READY, MINEOLA, NY
 
 
 3
 Present JACOBS, CALABRESI, LAY,* Circuit Judges.
 
 
 4
 In March 1984, Calabritto was hired to be an Assistant Detective Investigator Aide in the DA's Office of Nassau County ("Office"). She was subsequently promoted to Assistant Detective Investigator I in 1988, and to Assistant Detective Investigator II in 1989. In February 1990, Dillon selected Calabritto to serve on the United States Customs Task Force ("Task Force"), a group that conducted long-term investigations of financial frauds. The first woman from the Office assigned to a Task Force, Calabritto was chosen over a more experienced male investigator who also applied for the job.
 
 
 5
 In the fall of 1991, the County Executive notified Dillon that the Office's proposed 1992 budget would be reduced by approximately $4 million. Dillon testified that because salaries make up approximately 90% of the Office's operating costs, he decided to meet his budget by firing employees. He further stated that he made the decision of whom to terminate based on maintaining the office's core function of "prosecuting cases for which arrests have already been made." Dillon laid off nine employees, which had the effect of eliminating the line of assistant investigators. One of these employees was Calabritto, who was informed on December 19, 1991 that she would be terminated effective January 1992. Dillon also accepted resignations from five assistant DAs. Of the fourteen people who left, seven were men and seven were women.
 
 
 6
 In January 1994, the plaintiff commenced suit in the Eastern District of New York, alleging employment discrimination on the basis of sex in violation of Title VII. The district court considered Calabritto's claims that she had suffered from "disparate treatment" and a "pattern and practice" of discrimination. It then entered judgment in favor of the defendant and dismissed the complaint.
 
 
 7
 On appeal, the plaintiff contends that the court erred in finding that she had not proved discriminatory treatment or a "pattern and practice" of discrimination. Because a finding of discrimination under Title VII is a finding of fact, we review for clear error. See Cornwell v. Robinson, 23 F.3d 694, 706 (2d Cir.1994). The plaintiff further alleges that the district court erred in failing to treat this case as a "mixed motive" or a "disparate impact" case. Insofar as the plaintiff did not raise these claims below, we review only for plain or fundamental error. See Vichare v. Ambac, Inc., 1996 WL 784099, at * 3 (2d Cir.1996).[1]
 
 A. Discriminatory Treatment
 
 8
 Calabritto first maintains that the court erred in finding that she had not proved discriminatory treatment under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). The court reached that conclusion by applying the three-part McDonnell Douglas test. First, it found that the plaintiff had established a de minimis prima facie case; second, it determined that the budget cut constituted a "legitimate non-discriminatory reason" for the defendant's decision to terminate the plaintiff; and third, it found that this reason was not pretextual. Based on this analysis, the court found that the plaintiff had not proved discriminatory treatment.
 
 
 9
 On appeal, Calabritto focuses on the last prong of the McDonnell Douglas test, contending that the "budgetary constraint" was a pretext for sex discrimination. Her arguments to this effect are without merit. For example, the plaintiff maintains that her termination did not significantly decrease the projected financial shortfall caused by the budget cuts. Yet the fact that her salary on its own was insufficient materially to ameliorate the Office's financial position does not, without more, indicate that the budget cut was a pretextual reason for termination. Second, Calabritto claims that her position on the Task Force brought money into the DA's Office. This, however, only suggests that budgetary grounds would support having someone from the DA's Office serve on the Task Force. And the plaintiff concedes that Office employees continued to do just that after her termination. Finally, Calabritto alleges that some of the budget cuts were restored by April of the year in which she was discharged. Assuming arguendo that this is true, the plaintiff does not dispute that the defendant was unaware that he might regain the funds at the time of her termination.
 
 
 10
 The district court did not err in finding that the plaintiff's McDonnell Douglas claim was without merit.
 
 B. Pattern and Practice
 
 11
 The plaintiff next argues that Dillon was complicit in a "pattern or practice" of discrimination. To show this, the plaintiff must prove "that unlawful discrimination has been a regular procedure or policy followed by [her] employer." International Bhd. of Teamsters v. United States, 431 U.S. 324, 360 (1977).
 
 
 12
 The district court acknowledged that there was "some evidence of gender discrimination by the Office of the District Attorney." Specifically, the court noted past acts by the Chief Investigator and the Deputy Chief Investigator, such as the failure to assign female investigators to hazardous assignments, that reflected a paternalistic attitude. The court then found, however, that "the last act of 'paternalistic' treatment occurred in 1988, four years prior to the employment decisions at issue." It therefore held that "such discriminatory acts could not be a cause of the termination of the plaintiff."
 
 
 13
 The district court's analysis is open to question, given that four years is not a long time. But the plaintiff's evidence of acts post-dating 1988 that might support the view that such a pattern or practice continued is extremely weak. The plaintiff relies heavily on the fact that four women were not hired for an entry-level position after they failed a qualifying test, while many men who failed an exam for a higher-level position remained in the Office at a lower position. This data is unhelpful because the women and men were differently situated, because most of it pertains to activity that occurred before 1988, and because the four women who were not hired were replaced by three women and one man. On this record, we cannot say that the court's determination was clearly erroneous.
 
 C. Mixed Motive
 
 14
 The plaintiff next argues that the district court erred in failing to find that this was a "mixed motive" case. Under the mixed motive theory, an employer may be liable even if it has a legitimate motive for discrimination, provided that an illegitimate motive played a motivating or substantial role in the challenged employment action. See, e.g., Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1181 (2d Cir.1992) (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 258 (1989) (plurality opinion)). While the court stated that it declined to analyze the case under a "mixed motive" framework, it nonetheless specifically found that the plaintiff did not show that sex discrimination played a "motivating or substantial role" in her termination. Because, as noted above, the budget cuts alone were quite sufficient to have caused the firing, the district court's finding to that effect was not erroneous.
 
 D. Disparate Impact
 
 15
 Finally, the plaintiff maintains that the elimination of the Assistant Investigator position had a disparate impact on women in violation of Griggs v. Duke Power Co., 401 U.S. 424 (1971).[2] This could have been Calabritto's strongest claim, as there is evidence that this line of positions was developed in order to increase the number of minorities and women in the Office. As the defendant points out, however, the claim suffers from severe procedural defects. First, it was not raised until after trial (in a post-trial motion). Second, Calabritto throughout the proceedings focused on her own termination, not on the termination of the line of positions. As a result, the defendants were, in effect, precluded from defending themselves on this claim. Under the circumstances, the district court did not err in not considering disparate impact.
 
 
 16
 We have considered all of the plaintiff's arguments, and find them to be without merit. The judgment of the district court is therefore affirmed.
 
 
 
 *
 The Honorable Donald P. Lay, Senior Circuit Judge of the United Sta tes Court of Appeals for the Eighth Circuit, sitting by designation
 
 
 [1]
 The Vichare court noted that it is an open question whether the plain error or the fundamental error standard applies when an argument is raised for the first time on appeal. That court did not need to resolve that issue--nor do we
 
 
 [2]
 The defendant contends that the plaintiff is foreclosed from asking the court to consider a disparate impact argument after having made a discriminatory treatment argument. It is clear, however, that a plaintiff may plead these claims in the alternative. See, e.g., Grant v. Bethlehem Steel Corp., 635 F.2d 1007, 1010, 1013-20 (2d Cir.1980); cf. Lowe v. Commack Union Free Sch. Dist., 886 F.2d 1364,1370 (2d Cir.1989) (noting, in analogous ADEA context, that "plaintiffs' having raised a disparate treatment claim did not preclude them from proving the alleged discrimination by means of a disparate impact claim")