Rose L. **COSER, et al., Plaintiffs,**

v.

Elizabeth L. **MOORE, et al., Defendants.**

No. 76 C 856.

United States District Court,
E.D. New York.

Aug. 3, 1983.

Vladeck, Elias, Vladeck, & Engelhard, P.C. by Judith P. Vladeck and Joseph J. Garcia, New York City, for plaintiffs.

Robert Abrams, Atty. Gen. by Lillian Z. Cohen and Michael F. Tietz, Asst. Attys. Gen., New York City, for defendants.

## MEMORANDUM AND ORDER

GEORGE C. PRATT, Circuit Judge (sitting by designation): *

### I. INTRODUCTION.

Thirty-four current and former female employees of the State University of New York at Stony Brook ("Stony Brook"), as individuals and as representatives of a class of teaching and non-teaching professionals employed at Stony Brook on or after February 11, 1974, and applicants for those positions, brought this sex discrimination suit under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), seeking monetary, declaratory, injunctive, and any other appropriate relief to remedy Stony Brook's allegedly discriminatory employment practices. Defendants are the president of Stony Brook, the chancellor of the University of the State of New York, and the members of the Board of Trustees of the state university.

By memorandum and order dated June 22, 1977, the court granted plaintiffs' motion for class certification to the extent of certifying under FRCP 23(b)(2) a class "solely with respect to plaintiffs' claim that at Stony Brook there exists a system-wide pattern and practice of discrimination based on sex." The class certified consisted of

* Of the U.S. Court of Appeals, Second Circuit, sitting by designation.

all women who in the past may have been or in the future may be discriminated against on the basis of sex by defendants' practices with respect to recruiting, hiring, termination, job assignment, promotion, compensation, and other terms, privileges, and benefits of employment and who either (1) have been employed by Stony Brook as a teaching or non-teaching professional at any time on or after February 11, 1974, or (2) may be so employed by Stony Brook in the future, or (3) once unsuccessfully applied for employment as a teaching or non-teaching professional with Stony Brook at any time on or after February 11, 1974, or (4) who may apply for such employment in the future.

Plaintiff's claim of pervasive, system-wide discrimination on the basis of sex satisfied the requirement of FRCP 23(a)(2) for a question of law or fact common to the class. After the class was certified, the parties agreed to and the court approved of a bifurcated trial in which the class issue of a pattern or practice of system-wide discrimination would be tried first, it being intended that after resolution of that central issue, the parties would then work out with the court an appropriate method for resolving whatever issues remained.

On the trial that has taken place, plaintiffs sought to prove a pattern and practice of discrimination against teaching and non-teaching professional (NTP) women with respect to virtually all terms and conditions of employment, including recruitment, hiring, initial placement, promotion, tenure, and salary. Plaintiffs also claim that women are excluded, or virtually excluded, from the highest ranks in the university, and are found in disproportionately high percentages in certain traditionally female departments and in the lowest NTP and faculty ranks. After extensive discovery that continued for over five years, the court tried, with the consent of the parties, the single class-oriented issue of whether defendants engaged in a pattern or practice of discriminating against female professionals at Stony Brook.

The court has carefully reviewed the testimony of the witnesses who testified at trial, the exhibits admitted into evidence, and the arguments made by counsel, both at trial and in their pre-trial and post-trial briefs. This memorandum constitutes the court's decision in accordance with Fed.R. Civ.P. 52. The court concludes that plaintiffs have failed to prove that Stony Brook has a university-wide pattern or practice of unlawful sex discrimination; consequently the class action portion of this case will be dismissed.

A. Jurisdiction and Venue.

The court has jurisdiction of this action under § 706 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–5(f)(1970). Each named plaintiff filed charges with the Equal Employment Opportunity Commission complaining of various acts of discrimination arising out of her employment at Stony Brook, and each received her "right to sue" letter pursuant to § 706(f)(1) of Title VII. Within 90 days thereafter, plaintiffs commenced this action.

The Board of Trustees of the University of the State of New York, the chancellor of the state university system and the president of Stony Brook are employers within the meaning of § 701(b).

Venue is proper within this district under 28 U.S.C. § 1391(b), because many of defendants' allegedly unlawful employment practices occurred at Stony Brook within this district.

B. Theory of Action.

Since the only issue to be tried was the class claim of a pattern or practice of sex discrimination, little evidence bearing on individual discrimination claims of named class members has been presented. By agreement, those claims were to be addressed separately after determination of plaintiffs' pattern or practice claim.

Plaintiffs tried this case primarily on the strength of statistical evidence prepared by their expert witnesses, Drs. Killingsworth and Aboud, that was designed to show a university-wide work force imbalance and a

treatment of women that was less favorable than of men with respect to specific terms and conditions of employment. Based on their statistics, plaintiffs ask the court to find that Stony Brook has certain facially neutral practices and policies that have a disparate impact on women, and from that, to infer that Stony Brook has a pattern or practice of discrimination against women. Plaintiffs also presented testimony by various Stony Brook administrators and former and present employees, in order to strengthen the inferences sought to be drawn from the statistical evidence.

The court accepts plaintiff's statistics insofar as they show that Stony Brook's work force is "sex-stratified", in that women are distributed primarily in lower-level, and hold relatively few upper-level, teaching and administrative positions. The central issue in this case, therefore, was whether plaintiffs have shown that this sex-stratification is a result of illegal discrimination on account of sex, or that the stratification is otherwise the result of facially neutral criteria that fall disproportionately on women and that lack any business justification.

Defendants challenged the validity of plaintiffs statistics, they questioned their underlying assumptions, they disputed the inferences plaintiffs urged the court to draw from the statistical picture, and they introduced independent statistical evidence of their own, prepared by Dr's. Welch, Lillard, and Meyer. Defendants claim that since the beginning of the liability period, February 11, 1974, Stony Brook has treated women and men equally. According to defendants, the workforce stratifications and imbalances that are shown by the raw numbers with respect to hiring, promotions, and salaries do not establish a pattern or practice of system-wide sex discrimination.

C. Guiding Legal Principles.

In order to prevail on a pattern and practice claim under Title VII plaintiffs must prove that sex discrimination was Stony Brook's "standard operating procedure—the regular rather than the unusual practice." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977) (hereinafter *"Teamsters"*). The legislative history of Title VII makes clear that plaintiffs must prove more than "isolated sporadic incident[s]," of discrimination. *Id.* Plaintiffs must show a repeated, routine, or generalized pattern of sexually discriminatory policies or practices. *See id.*, quoting 110 Cong.Rec. 14270 (1964) (remarks of Senator Humphrey).

In most Title VII cases plaintiffs present either a disparate treatment or disparate impact theory of discrimination. Either theory can be applied to a given set of facts. *Teamsters*, 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15. Under either theory plaintiffs have the initial burden of establishing a prima facie case of discrimination. *Id.* at 336, 97 S.Ct. at 1855; *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) (disparate treatment); *Guardians Association v. Civil Service Comm'n* 633, F.2d 232, 239 (2d Cir.1980), *aff'd* —— U.S. ——, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1980) (disparate impact).

In order to prevail on a disparate treatment claim, plaintiffs must prove defendants acted with a discriminatory motive, although motive is inferable merely from differences in treatment. *Teamsters*, 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15. In a disparate impact case, plaintiff must demonstrate that employment practices or policies that are facially neutral in their treatment of different groups in fact fall more harshly on one group than another and cannot be justified by business necessity. *Teamsters* at 335 n. 15, 97 S.Ct. at 1854 n. 15; *Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977).

It is settled that "[w]here gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of dis-

crimination." *Hazelwood School District v. United States,* 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977); *Grant v. Bethlehem Steel Corp.,* 635 F.2d 1007, 1015 (2d Cir.1980), *cert. denied* 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981). The usefulness of statistics however, "depends on all the surrounding facts and circumstances." *Teamsters,* 431 U.S. at 340, 97 S.Ct. at 1857. In this circuit, it is clear that plaintiffs can establish a prima facie case in a discriminatory impact case by statistical evidence alone. *Guardians Ass'n v. Civil Service Comm'n,* 630 F.2d 79, 88 (2d Cir.1980), *cert. denied,* 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981); *Grant v. Bethlehem Steel Corp.,* 635 F.2d 1007, 1017–18 (2d Cir.1980), *cert. denied,* 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981).

The Supreme Court has not defined with precision what showing of statistical disparity is required to make out a prima facie case, and has cautioned that the level is not inflexible—"statistics are not irrefutable" and may be rebutted. *Teamsters,* 431 U.S. at 339–40, 97 S.Ct. at 1856–57. Courts that have applied Title VII to universities have required plaintiffs show a gross statistical disparity with respect to each allegedly discriminatory claim in order to establish a prima facie case. *See Wilkins v. University of Houston,* 654 F.2d 388, 398 (5th Cir. 1981).

Once a plaintiff makes a prima facie showing of discrimination, the burden then shifts to the defendant to articulate a non-discriminatory explanation or justification for the inferences raised by plaintiff's evidence. While the precise burden that shifts to the defendant necessarily varies according to the facts and theory of the case, generally the defendant must proffer a non-discriminatory explanation to rebut the inferences raised by plaintiffs' evidence. The defendant may do so, for instance, by showing that plaintiffs' proof is inaccurate or insignificant, *Teamsters,* 431 U.S. at 360, 97 S.Ct. at 1867; or that a facially neutral criterion that has a discriminatory impact is job-related, *see Griggs v.*

*Duke Power,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971); *Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977); or that the claimed discriminatory pattern is a product of conduct that occurred before the act applied to defendants, *Teamsters,* 431 U.S. at 360, 97 S.Ct. at 1867, or is immunized by the applicable statute of limitations, *United Airlines v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977).

Should defendants succeed in rebutting plaintiff's prima facie case, the burden shifts back to the plaintiff to show that defendants' presumptively valid reasons for rejection were in fact "a coverup for a * * * discriminatory decision." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 805, 93 S.Ct. 1817, 1826, 36 L.Ed.2d 668 (1973). Despite this elaborate technique for structuring the trial, once all the proof is in, the ultimate burden of persuasion remains with the plaintiff. *Texas Department of Community Affairs v. Burdine,* 447 U.S. 920, 100 S.Ct. 3009, 65 L.Ed.2d 1112 (1981). However, the Supreme Court recently emphasized that the prima facie case method established in *McDonnell Douglas* was "never intended to be rigid, mechanized, or ritualistic." *United States Postal Service v. Aikens,* 460 U.S. 711, ——, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) *quoting Furnco Construction Co. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), and once defendant has presented evidence in a Title VII case, the duty of a district court is to decide whether the plaintiff has met its ultimate burden of persuading the court that defendant has discriminated in violation of Title VII *United States Postal Service v. Aikens,* 460 U.S. at ——, 103 S.Ct. at 1481.

Applied to this trial, plaintiffs' burden was to establish that after February 11, 1974 and with respect to its teaching and non-teaching professionals, Stony Brook has engaged in a pattern or practice of treating women less favorably than men, solely because they are women. To decide this question it is necessary to re-

view and make findings concerning the structure of the university, the hiring procedures and policies, and the facts and statistical analyses pertaining to hiring, placement, promotion, tenure, and salaries.

## II. FINDINGS OF FACT.

### A. University Structure.

#### 1. Academic Divisions.

The State University at Stony Brook is a state-operated university founded in 1957 and designated in 1960 as one of four university centers of the State University of New York, pursuant to Article VIII of the Education Law of the State of New York. N.Y. Education Law § 352(3) (McKinney 1969 & Supp.1982). Stony Brook is a research university that offers degrees at the undergraduate, graduate, and professional levels.

As chief administrative officer of Stony Brook, the president is directly responsible to the chancellor and trustees of the State University. With the advice of academic and professional employees, he is primarily responsible for the appointment of members of the teaching staffs, the recommendation and approval of salary increases, and the promotions in rank. During all relevant times during the liability period of this litigation John Toll was the president of Stony Brook. He has since been succeeded by John H. Marburger, III. Dr. Sheldon Ackley was special assistant to the president and assisted in many matters of personnel.

Stony Brook is divided into a "Core Campus" and a "Health Sciences Center." The core campus includes the College of Engineering and Applied Sciences, the W. Averell Harriman College for Urban and Policy Sciences, the College of Arts and Sciences, the Marine Sciences Research Center, and the Institute for Theoretical Physics. The Health Sciences Center (HSC) includes the Schools of Medicine, Dental Medicine, Social Welfare, Allied Health Professions, Basic Health Sciences (incorporated into the School of Medicine in 1980), and Nursing.

Each of the academic units is headed by a dean, provost, or director, who is responsible to the academic vice president and who has primary responsibility for formulating academic policy within that unit. While the president retains primary responsibility for the policies and operation of Stony Brook, the academic vice-president has supervisory authority over all academic personnel and programs on campus. During the entire liability period, Dr. Sidney Gelber was the academic vice-president.

#### 2. Work Force Structure.

The employees of Stony Brook can roughly be divided into academic employees, non-teaching professionals (NTP's), administrative personnel, and civil service personnel. Civil service and administrative personnel are not subjects of this litigation, which is brought on behalf of only academic employees (faculty) and NTP's. In some instances library employees have been dealt with by the parties separately, since they include both academic employees and NTP's, and they present some special problems. All faculty, library, and NTP employees have been represented by collective bargaining agents since 1971.

Academic employees are divided into five categories: professors, associate professors, assistant professors, instructors, and lecturers. A person is promoted to a full professorship after many years of distinguished university service marked by outstanding professional accomplishment. It is the highest academic rank within the university. An associate professor ranks immediately below full professor, and differs only in "the length and extent of service in academy or experience outside the university." An assistant professor is the beginning level of full academic appointment. Stony Brook hires instructors infrequently and in unusual circumstances. "Lecturer" is a catch-all category often given to newly hired teachers who have not yet completed their PhD's. After receiving their doctoral degrees, lecturers are eligible to become assistant professors. Other lecturers are hired to replace faculty on leave, or to assist a faculty member with

research. From 1974 to 1977, Stony Brook hired 42 lecturers.

People having the rank of lecturer, or an academic rank preceded by "clinical," "visiting," or "research," hold a non-tenure track, "qualified" academic rank, and normally only for short periods of time.

Except for the qualified ranks, the academic categories are linked for purposes of salary and promotion. For example, an instructor is normally promoted to the rank of assistant professor, an assistant professor to associate professor, and an associate professor to full professor.

The library work force is made up of faculty employees and NTP's. At the library faculty level are the director of the library and those holding titles of librarian, associate librarian, senior assistant librarian, and assistant librarian, all of whom are eligible for tenure. As with the regular faculty, these positions are also linked.

Prior to 1977 librarians were classified into "PR" ranks along with NTP's. They now have independent library ranks, but are still assigned to NTP ranks for salary purposes, although they have a separate salary schedule. Many of the NTP positions in the library require specialized language training. Some upper level NTP employees are "joint appointments" to the faculty, but are also assigned a PR rank.

The remainder of the professional service consists of NTP's. Each NTP rank consists of a wide variety of discrete jobs, each requiring different qualifications and experience. NTP positions are not linked, and while a few NTP employees are eligible for permanent appointment, most are not. Stony Brook has 146 NTP positions roughly divided into eight "PR ranks." Each PR rank primarily establishes salary limits and is neither relevant for promotion nor, taken alone, indicative of responsibility except in the most general terms. Job applicants are interviewed for specific NTP jobs. Salary and rank are established before recruitment or interviewing begins. The highest PR rank is 8, which the president alone holds. Within a given PR rank, salaries cover a wide range, and the salary ranges of different PR ranks overlap.

B. Affirmative Action Policies.

Stony Brook has no official policies that explicitly operate to the disadvantage of women. On the contrary, Stony Brook's administration is firmly committed to complying with the letter and spirit of Title VII. Stony Brook has acted in good faith, even before Title VII required it to do so, to ensure that it's policies and practices have operated without discrimination based on sex.

Equal treatment of women and minorities was a serious concern at Stony Brook throughout the 1970's. Many of the policies and actions taken by Stony Brook administrators indicate an awareness of and a sensitivity to the treatment of women at Stony Brook, although it may be true that at least in part the impetus for these actions was due to the dissatisfaction voiced by various women's groups on campus.

In 1969, before Title VII applied to state universities, Stony Brook became subject to Executive Order 11246, which required it periodically to report regarding the status of women and minorities. In response, the president appointed Vera Rony to be the Affirmative Action Coordinator in the newly-created Office of Equal Opportunity, which reviewed all university affirmative action policies, prepared affirmative action reports, and processed discrimination complaints. Lee Yasamura, who was and continued to be the personnel director, replaced Rony as Affirmative Action Coordinator when Rony left that post in 1975.

The president also created an Advisory Committee on Equal Opportunity ("president's EOC") to advise him on affirmative action policy within Stony Brook. He established equal opportunity committees (area EOC's) in every vice presidential department within the core campus to define and monitor their respective affirmative action policies. He also required each university department to report to area vice-presidents on affirmative action matters. The chair-people of the area EOC's were all members of the president's EOC. Women

have served on these area EOC's in substantial numbers.

In the fall of 1971, anticipating a large amount of hiring at the HSC, Dr. Edward Pellegrino, Dean of the HSC, established policies and procedures for the recruitment of women and minorities and established an area EOC on that campus to monitor those procedures. In 1972, Academic Vice President Gelber established similar policies for the core campus.

Official university pronouncements also indicated that affirmative action was a continuing goal of the administration. For instance, on April 16, 1971, President Toll stated:

> In nearly all university disciplines, the representation of minority groups and of women has been disproportionately low. Hence every operating unit of the university (academic, administrative, and staff) must make real efforts to recruit candidates from minority groups and women as replacements or occupants of new lines.

The president termed compliance with this directive "both a legal and a moral requirement" and urged that Stony Brook "be in the vanguard of practical response to one of the major social concerns of our day." Consistent with these policies, Stony Brook established specific directives, discussed below, regarding affirmative action in hiring and promotion.

In December, 1973, the chairman of the Faculty Senate Executive Committee requested the president to appoint a "Salary Equity Task Force" (SETF)—comprised of four women and two men—to review the salaries of women and minorities at Stony Brook. The SETF recommended that the university make further studies regarding the differences of salaries between men and women. While Stony Brook published no formal study in response to this recommendation, it did conduct individual reviews of minority and women faculty whose salaries were more than one standard deviation below the expected salary, and awarded some employees retroactive salary increases.

In 1975, Presidential Assistant Ackley prepared an affirmative action plan (1975 AAP), which found that women were "underutilized" at Stony Brook—that is hired in fewer numbers than predicted by their representation in the appropriate labor pools—by 8% to 9%. The 1975 AAP also presented a comprehensive university-wide program to comply with federal equal opportunity regulations.

The president's EOC, which also issued a report making suggestions regarding affirmative action, objected to the 1975 AAP. Similarly, after the 1975 Plan was submitted to the United States Commission on Civil Rights, the commission responded that it was dissatisfied with the plan because it failed to establish a time table or goal as to how the university would comply with various federal regulations. Stony Brook never formally replied to these objections. A second affirmative action plan, however, was prepared in 1980; it is discussed at greater length *infra.*

Although women's groups at Stony Brook expressed dissatisfaction with the administration's policies regarding women, the evidence, taken as a whole, does not support any claim that the university acted pretextually or in bad faith in making its official pronouncements or attempting to establish and implement policies designed to ensure the non-discriminatory treatment of women.

C. Hiring Procedures at Stony Brook.

1. In General.

Stony Brook's hiring procedures are facially neutral. The president appoints those faculty, who "... are, in his judgment, best qualified." Although the president has nominal authority to hire faculty, NTP's, and library staff, as a practical matter the hiring process at Stony Brook is decentralized, and many people, at various levels of the university, participate in these decisions.

Faculty hiring decisions are primarily made by department chairmen acting on the recommendation of a hiring search committee. NTP decisions are made in the

same manner, but by an area vice president acting on the recommendation of a search committee. Normally, the president ratifies these decisions through the appropriate vice president, and exercises only minimal and formal supervision.

In the 1960's, Stony Brook as a new university sought to establish quickly a national reputation by hiring faculty and administrators who themselves had national reputations. For instance, Stony Brook hired C.N. Yang, a Nobel laureate in physics, in order to attract other outstanding faculty and students in the "hard" sciences. President Toll was hired from the department of physics and astronomy at the University of Maryland. H. Bentley Glass was a professor of biology at John Hopkins University before becoming Stony Brook's academic vice president. These appointments and other similar ones were made outside of the normal hiring procedures. Their purpose was to enable Stony Brook to recruit in competition with other national universities.

Stony Brook has acted in good faith to establish affirmative action policies which ensure that its hiring practices comply with the letter and spirit of the civil rights laws. While plaintiffs presented evidence of some instances where these procedures were not followed, the court finds these departures to be isolated instances and primarily made for non-discriminatory reasons, such as to attract well-known faculty. The clear weight of the evidence indicates that on the whole Stony Brook has complied with its declared internal policies for hiring both faculty and NTPs.

We turn next to an examination of these policies and to plaintiffs' claims that they are "subjective," "flexible," and operate to the disadvantage of women.

### 2. Specific Hiring Directives.

Sex is not a bonafide occupational qualification for any position at Stony Brook, and there is nothing in Stony Brook's formal hiring policies that discriminates against women on account of sex. Stony Brook has actively recruited women and minorities during the liability period.

On October 8, 1974, President Toll approved affirmative action policy statement P–9, which directed that:

> The university has a special obligation to take affirmative action to seek out candidates for employment from [groups that may be disadvantaged because they have not traditionally been represented in particular professional fields]. The university's personnel appointment and recruiting procedures will provide for the implementation of this policy.

P–9 established area EOC's to monitor compliance with affirmative action directives within specific departments or areas within the university, and gave the president's EOC general supervisory authority over the actions of the area EOC's.

P–9 required that all faculty appointments and promotions and all NTP appointments and promotions above the PR–4 level be submitted to an area EOC for advice on the extent and manner of recruitment, before actual recruitment began. This involved the area EOC's in the hiring and promotion process at the earliest possible date. Although approval by an area EOC was not necessary for faculty appointments of less than one year or for NTP appointments at a level of PR–3 or below, P–9 nevertheless directed that the appropriate area EOC be notified of the short-term appointments in a "timely manner."

The procedures for faculty hiring, which are representative of the normal hiring procedures at Stony Brook, were announced July 21, 1975 in PR–320. The first step in recruitment is for the department or school seeking to fill a vacancy to prepare a "recruitment plan," whose proposed procedures are reviewed by the appropriate area EOC prior to actual recruitment. These procedures include posting and advertising a vacancy in newspapers and professional journals. The evidence shows that no appointment could be made unless these procedures were followed, and plaintiffs presented no evidence to suggest these procedures were normally disregarded.

PR–320 required that the person responsible for making the hiring recommendation receive authorizations to begin recruitment and to form search committees to assist in recruitment. It also required that each search committee prepare a "SUSB–68–1 EEO Affirmative Action Worksheet" for each candidate interviewed and considered. Stony Brook generally followed these procedures.

SUSB–68 was used in all recruitment procedures during the liability period. Form SUSB–68 required each search committee to record affirmative action data for each proposed appointment, including information about the race and sex of all applicants, advertisements placed, and responses received. It also required that each applicant meet certain minimal qualifications. In addition, SUSB–68 required documentation of each applicant's interview and each applicant's declination information. All of this information was forwarded to the area EOC along with the name of the applicant or applicants selected for the position. After the area EOC reviewed the SUSB–68 and approved the candidate, the candidate's name was forwarded to the vice president's office who reviewed the candidate's file and notified the applicant.

Stony Brook had similar procedures for NTP positions. P–36 governed NTP hiring, and required extensive advertising and posting for all NTP vacancies. It imposed broader advertising requirements than P–320, particularly in respect to posting vacancies at other SUNY campuses. The evidence before the court did not indicate that these procedures were disregarded for NTP or library hiring.

Plaintiffs maintain that despite these elaborate policies to promote affirmative action and ensure non-discriminatory hiring, the procedures were flexible and frequently circumvented. Plaintiffs claim that department chairmen, most of whom were male, make all hiring decisions. Plaintiffs also claim that search committees "rubber-stamp" employment decisions made—presumably by department chairmen—before the selection process begins.

The testimony of Dr. Entine and of plaintiff Miller shows that some search committees "pre-selected" candidates and then tailored recruitment to comply with procedural requirements. Plaintiff Miller admitted she had participated in three "phony" searches, each of which was to hire a full professor. She testified that two of the three searches were initially honest, but had been unsuccessful. She testified that "when it came to assistant professors, lecturers, instructors, then, of course, searches were probably much more honest."

Defendants respond that in the few instances that committees preselected candidates, they did so to attract top candidates who had received competing offers from other universities. Defendants claim that to compete effectively, Stony Brook needed to make a firm offer for a position, and as a result, search procedures were abbreviated.

The court is satisfied that these were isolated, occasional events that usually involved searches for a full professor needed to fill a particular teaching need in a department. University personnel disapproved of such practices, and these isolated abuses, given the university's reaction, are insufficient to prove that Stony Brook had a university-wide pattern and practice of ignoring formal hiring directives, or that search committees normally operated to the disadvantage of women.

As to searches for positions other than full professor, plaintiffs presented no credible evidence to indicate that members of the search committees were discriminatorily selected or that the search procedures themselves were discriminatory. The evidence showed that the area EOC's normally performed their supervisory responsibilities with diligence, and when necessary, refused to approve searches.

Defendants showed, and plaintiff's witnesses conceded, that area EOC review was particularly vigorous for entry level positions such as assistant professor, but was admittedly less rigorous in searches for full professors, apparently in deference to the

specialized teaching needs of particular departments. Furthermore, women—including several of the class representatives—regularly served on these search committees.

The court accepts that the failure to comply with formal search guidelines in these isolated instances indicates that search procedures were flexible, but in view of the context in which the guidelines were circumvented and the infrequency of those departures, the evidence is insufficient to support an overall inference that all hiring procedures generally were "flexible" or routinely flouted. Nor do the departures support an inference that established policies and procedures were not followed in most searches. Nor do they support on inference that they were motivated by or resulted in unlawful sex discrimination.

As a practical matter, the ordinary search procedures were not well-suited to the practicalities of hiring senior faculty and top level administrators, and the court accepts this as a non-discriminatory explanation for such searches. Moreover, without evidence that these procedures resulted in hiring a disproportionate number of men in preference to equally qualified women, or that search committees were in some other way biased against women—evidence that is totally absent in this case—these few departures from the search committee procedures simply are not probative of plaintiffs' claim of a pattern and practice of sex discrimination.

D.   Statistical Proof of Discrimination.

As already indicated, plaintiffs rest their claim primarily on the statistical evidence presented at trial. Through that evidence they have attempted to establish a pattern or practice of sex discrimination in the hiring, placement, promotion, tenure, and salary treatment of professional women at Stony Brook. They also argue that the overall work force picture at Stony Brook implies the existence of sex discrimination in the university's employment decisions.

Plaintiffs' general presentation is superficially persuasive. Between 1972 and 1977 the professional work force was predomi-nantly male, with faculty ranging from 13 to 19% female and NTP's from 26 to 40% female. From 1972 to 1977 the majority of newly hired professionals were male, with 28% female faculty hired and 47% female NTP's hired. The raw data also shows more males among the higher ranking faculty and NTP positions whether viewed as work force at a particular time, or as newly-hired personnel during the various periods. Plaintiffs also show that some of Stony Brook's departments have no females at all, that other departments such as library and nursing are predominantly female, and that generally females are concentrated at the lower end of the economic and promotion scales.

All of the foregoing certainly implies that in abstract terms, women have not been treated equally with men as to those aspects of our society and economy that have resulted in being employed at Stony Brook. They do not, however, necessarily imply a pattern or practice of unlawful sex discrimination by the university. The problem of unlawful discrimination is far more subtle and elusive than raw numbers relating to the work force, rankings, and salaries at any particular time. As applied to this case, the issue of discrimination involves such questions as: What period of time do we consider? What is the impact of a separate trial of the pattern or practice issue? What actually happened during the liability period, the period for which defendants can be held legally responsible? How many women were actually available to be hired for the positions at Stony Brook? How many women were realistically available to be promoted and to be granted tenure? Does the conduct of defendants during the liability period suggest discrimination is the rule rather than the exception?

In general terms, when one looks behind plaintiffs' raw numbers, which are fairly impressive on first glance, one finds that the factors that have caused the present imbalances between men and women at Stony Brook are most likely a result of historical economic and social conditions

that long predate the liability period, and that in many cases are unrelated to Stony Brook itself. If a work force imbalance results from intentional discrimination by Stony Brook that occurred prior to 1972, when discrimination on grounds of sex was not unlawful for universities, it affords no basis for finding either a post-1972 pattern and practice of unlawful sex discrimination or a post-1974 liability to plaintiffs, *United Airlines v. Evans, supra.*

In short, the raw numbers, taken alone, mean relatively little. With claims of hiring, placement, promotion and tenure, they must be compared with the applicable availability pools, i.e., the percentage of women in the work force who are qualified and available to fill the positions in question. Since a university such as Stony Brook demands highly educated, specially qualified people to fill particular positions, its treatment of minorities cannot be evaluated in the same manner as that of, say a trucking company or factory that can hire many people with less differentiated qualifications. Instead, to fairly interpret plaintiffs' claims it is necessary to evaluate the numerical data carefully in light of the available people and their relative qualifications, as well as to consider the external facts of history, the employment market and social factors over which defendants have no control.

With these cautions in mind, we will consider plaintiffs' claims and the evidence relating to hiring, placement, promotion, tenure, and salary.

1. Hiring.

Plaintiffs claim that defendants have discriminated against women in hiring faculty; there is no claim of discrimination in hiring NTP's. In general terms, in order to evaluate the claim of discrimination in faculty hiring we must compare the male/female ratios of hirings with the male/female ratios in the relevant labor force, the so-called availability pools. *Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). Defendants' pre-act hiring conduct could have been relevant to the pattern or practice claim, but plaintiffs presented no evidence of pre-act availability pools against which to compare the hiring decisions. Stony Brook hired faculty for approximately ten years before 1972 when the act first applied to public employers and universities. During the same ten-year period of time there were significant changes in the numbers and percentages of women entering various teaching fields. Consequently, it would be improper to read back into the sixties availability pool figures based on conditions in the early and mid seventies.

An additional conceptual problem is presented by two circumstances: (1) prior to 1972 sex discrimination at Stony Brook was not illegal, and (2) while sex discrimination at Stony Brook would have been illegal between March 24, 1972, the effective date of the statute, and February 11, 1974 the cutoff date of the statute of limitations, that discrimination could not be remedied in this action. The problem is, in light of these two circumstances, what weight if any, should the court give in this "pattern and practice" trial to evidence of discriminatory actions that occurred prior to February 11, 1974?

Some help is offered by the majority opinion of the Supreme Court in *Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), a racial discrimination, pattern and practice suit wherein the court noted that work force statistics comparing the teaching staff with the racial composition of the qualified public school teacher population and the relevant labor market could make out a prima facie statistical case. Indeed, the Court of Appeals had found that such work force statistics conclusively proved the government's pattern and practice lawsuit. Criticizing that view, the Supreme Court stated:

The Court of Appeals totally disregarded the possibility that this prima facie statistical proof in the record might at the trial court level be rebutted by statistics dealing with Hazelwood's hiring after it be-

came subject to Title VII. Racial discrimination by public employers was not made illegal under Title VII until March 24, 1972. A public employer who from that date forward made all its employment decisions in a wholly non-discriminatory way would not violate Title VII even if it had formerly maintained an all-white work force by purposely excluding Negroes.[15] 433 U.S. at 309, 97 S.Ct. at 2742.

In footnote 15 to this passage, the court noted:

[15] This is not to say that evidence of pre-act discrimination can never have any probative force. Proof that an employer engaged in racial discrimination prior to the effective date of Title VII might in some circumstances support the inference that such discrimination continued, particularly where relevant aspects of the decision-making process had undergone little change.

In light of the Supreme Court's view and in the absence of any evidence of the relevant labor market before 1972, this court will concentrate its analysis of the statistics presented on those acts beginning in 1972, conscious of the fact that while defendants cannot be held liable to particular plaintiffs for acts that occurred outside the limitations period, i.e., before March 1974, conduct occurring between 1972 and 1974 is relevant on the issue of whether or not there existed a university-wide pattern or practice of unlawful sex discrimination. We do not have here a situation such as contemplated by the last few lines of *Hazelwood's* footnote 15, *supra*, because beginning even before the effective date of Title VII Stony Brook adopted significant and extensive changes in its processes for arriving at employment decisions.

The facts underlying plaintiffs' claim of discrimination in faculty hiring are simple. Plaintiffs' exhibits 147 and 183 summarize the raw data of hiring for each school year from 1972–73 to 1976–77 and break it down by departments and by academic rank at the time of hiring. That basic data sketches the hiring picture.

As to the relevant labor market, plaintiff offered no independent evidence, but instead relied upon calculations of the availability pools that were included in the 1975 and 1980 affirmative action plans (AAPs) prepared by Stony Brook pursuant to governmental regulations. Plaintiffs used the AAP's to show that Stony Brook had "underutilized" women in various departments.

According to federal regulations released by the Office of Federal Contract Compliance Programs, (OFCCP), women are underutilized when the estimated percentage of the women in the labor market exceeds the percentage of women actually hired. If Stony Brook hired applicants without regard to sex, the percentage of women hired should be approximately equal to the percentage of women in the relevant availability pool. Women are therefore over or underutilized to the extent that Stony Brook hires more or less than the "predicted" number of women. The predicted number of women is obtained by multiplying the percentage of women in the relevant availability pool by the total number of people hired in that category. In the 1975 AAP, defendants reported that of the 828 members of the faculty they underutilized women by 14, or 1.7% of the total aggregated departmental units. Data in the 1980 AAP was more detailed. It showed that as of 1978 Stony Brook underutilized women by 25, spread over 16 departments and schools, and overutilized women by 28, spread over 18 departments and schools, leaving a university-wide net overutilization of 3.

Plaintiffs argue that these statistics are more probative of defendants' discriminatory hiring practices than first appears, because both AAP's used national availability pools that, which plaintiffs claim, understate the "actual" availability of women, and (2) those studies show that Stony Brook hired women in "traditionally female departments and grossly under-hired or do not hire at all in most other disciplines." For instance, from 1974 to 1977, 16 of 66 (24%) of all female tenure track faculty hired by Stony Brook were hired into the

school of nursing, and 47% of the women hired were hired into the school of nursing or the libraries—traditionally female departments. The record does not show an availability pool for these positions. Plaintiffs argue that when Stony Brook's hiring decisions are analyzed without the "all-female schools of nursing and social welfare"

> the result is that only 78.9% of the female faculty expected to be hired were actually hired (*i.e.*, expected 26.6—actual 21), the percentage of women hired by the University decreases from the figure used by Dr. Welch, 25% ($^{41}/_{164}$), to only 14.6% ($^{21}/_{144}$)."

Plaintiffs also argue that between the 1975 and 1980 AAP's, the percentage of women on the Stony Brook faculty decreased, although the raw number of female faculty members increased slightly by seven. During this time, the number of men on the faculty increased by 106. While these figures are superficially striking, the court is unpersuaded by plaintiffs' continued attempts to prove discrimination by relying on raw data that ignore availability pools.

The court does not find either party's statistical evidence to be conclusive proof of discrimination (or its absence) and weighs most heavily the data that "measures" discrimination by comparing the actual number of women hired with the expected number in an appropriate availability pool. Neither AAP evaluated the discrimination and hiring claims according to the actual number of applicants of Stony Brook (which theoretically was available from the SUSB–68 forms), but instead used availability pools which were an estimate of the percentage of qualified nationally-available females in the various disciplines. Plaintiffs attempt to draw favorable inferences from the slight underutilization shown in defendants' AAPs—overall in the 1975 AAP and in selected departments in the 1980 AAP. The underutilizations in those reports are equivocal and unpersuasive, however, because (1) the slight adverse inference available is insufficient to overcome the weakness inherent in the im-

precise availability data, (2) in 1980, at least, they are counterbalanced by equivalent overutilization, and (3) neither AAP can fairly be characterized as showing a "gross statistical disparity."

Neither does the court accept plaintiffs' suggestion that the AAP's underestimate the availability pools of women by using national, rather than regional, availability pools. The parties agree that regional pools would increase the apparent availability of women. The court finds the more appropriate labor pool for both the 1975 and 1980 AAP's is national. Stony Brook is a highly regarded research university which attracted nearly 40% of its faculty (in 1976–77) from foreign countries or from states other than those from the "region" —New York, Pennsylvania, New Jersey, New England, California—suggested by the plaintiffs.

Stony Brook attracts faculty applicants from throughout the country. Its faculty has earned a national reputation, particularly in the hard sciences, and it recruits through national publications. It would be inappropriate to categorize Stony Brook's hiring as limited regionally, despite plaintiffs' evidence that from 1974–77, Stony Brook hired over 70% of its new faculty from California or the northeastern United States, and nearly 50% from New York, Pennsylvania, and New Jersey. The "national" availability pools in the 1975 AAP were a better measure of Stony Brook's applicants than the regional predictions urged by plaintiffs.

The court also accepts the "national" availability pools used in the 1980 AAP. Dr. Malcolm Agostini, Special Assistant to the President for Equal Opportunity, prepared the 1980 AAP availability pools using an 8–factor analysis according to the guidelines established in Revised Order No. 4 issued by the OFCCP. The availability pools were complied by dividing the faculty into two categories: full and associate professors, and assistant professors and below. The availability for full and associate professors was determined by calculating the percentage of women on faculty at

research universities found by the Carnegie Council publication, "A Classification of Institutions of Higher Education, Revised Edition, 1976," to be "similar" to Stony Brook. That percentage established the "expected" number of women on Stony Brook's faculty. The availability pools for "assistant professors and below" was determined by calculating the percentage of Ph.D.'s awarded to women between 1973 and 1977 in each of eight academic disciplines. The Stony Brook faculty was subdivided into these eight categories and the expected number of faculty was based on the number of Ph.D.'s awarded nationally in each category. The 1980 AAP and its methodology was endorsed by the president's AEOC and is accepted by the court.

While the proper availability pool necessarily depends on the specific hiring practices of Stony Brook, other courts considering Title VII claims brought against universities have also found the appropriate faculty labor pool to be national. *See, e.g., Wilkins v. University of Houston,* 654 F.2d 388 (5th Cir.1981); *Presseisen v. Swarthmore College,* 442 F.Supp. 593 (E.D.P.1977) *aff'd mem.,* 582 F.2d 1275 (3rd Cir.1978).

Plaintiffs' seek to excuse their failure to establish an appropriate availability pool by criticizing defendants for failing to analyze and summarize the information available on the SUSB–68 forms filled out by all applicants. Defendants respond, correctly, that the underlying burden was on plaintiffs and that it was their failing, not defendants', which deprived the court of that information.

Plaintiffs also argue that defendants mask the actual discrimination in the 1975 and 1980 AAP's by overaggregating departments. In the 1980 AAP, women were underutilized in 16 departments and overutilized in 18 departments; university-wide, women were overutilized by 3. Plaintiffs claim the excessive aggregation enables Stony Brook to hire many more than the expected number of women in traditionally female departments and hire no women in traditionally male departments, yet still show no university-wide underutilization of women.

The court finds to the contrary, however. The 1980 AAP showed that women were underutilized in the biological sciences, the HSC, and the libraries, but overutilized in the College of Arts and Sciences. There are 7 individual departments in which women are underutilized by more than 1 person, and an equal number of departments in which they are overutilized by more than 1. But taken as a whole the over and underutilizations cross cut departments and university divisions and do not follow a pattern of what is "traditionally" male or female. For instance, the 1980 AAP shows that women are underutilized in the departments of biology, political science, and physiology/biophysics, but overutilized in chemistry, history, and pathology. Indeed, plaintiffs refer to nursing and the library as traditionally female occupations, but there was neither over- nor underutilization in nursing, and in the library women were underutilized by 2. Thus, neither of those two departments could have skewed the picture in defendants' favor.

Finally, many of the departments in which women are underutilized combine few faculty members with a low availability percentage. There were 20 schools and departments that had no female faculty in 1978. In 9 of these, however, when the total faculty is multiplied by the availability pool percentage, the result is an expected female faculty component of less than .5, hardly a factor on which to rest claims of system-wide discrimination.

This conclusion is buttressed by the report of defendants' experts, Welch and Lillard (Welch Study), which, using a slightly different method of establishing a labor pool, showed that Stony Brook hired slightly fewer than the expected number of women. The Welch study concluded that the underutilization of women was "not statistically significant" and "could easily have occurred at random from a sex-blind hiring process." While the Welch study made a variety of questionable exclusions and alone is not conclusive, it does tend to

indicate that Stony Brook hired approximately the expected number of women at the higher faculty ranks. While the court does not attach great significance to this study and does not decide whether, taken alone, it would be sufficient to wholly rebut plaintiffs' prima facie case had they made one, it does tend to corroborate the court's conclusion.

Plaintiffs argue that under *Connecticut v. Teal,* 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982), evidence of defendants' non-discriminatory university-wide hiring is no defense to plaintiff's showing of underutilization of women in specific departments and divisions. But this argument ignores the implications of *Hazelwood, supra,* as to pre-act discrimination when applied to the early employment history at Stony Brook. Moreover, *Teal* does not apply here.

■■■ In a Title VII action brought by an individual, disparate impact analysis is a two-step process. First, once the individual shows that a facially neutral criterion has an adverse impact on plaintiff's class, the individual plaintiff is entitled to the inference that the employer discriminated against the individual. Then, if the employer is unable to come forward with a business justification for the criterion, or is unable to come forward with a non-discriminatory explanation as to the treatment of the individual, the individual prevails. Unlike the *individual* plaintiffs in *Teal,* plaintiffs here are a class of women seeking to prove by disparate impact analysis that Stony Brook has a pattern and practice of discrimination against women. If successful, that finding would then enable individual plaintiffs to rely on an inference of discrimination later when they seek to prove their individual claims.

In *Teal,* four blacks proved they were not considered for promotion because they failed a written examination that had a proven adverse impact on blacks. The district court had dismissed their Title VII claims because the employer proved that although the examination had an adverse impact, blacks as a group were actually favored by the employer's ultimate promotion decisions. The Supreme Court held that evidence that an employer's "bottom line" practices had no adverse impact on blacks as a group was no defense to the proven claims of discrimination brought by individuals. The error of the district court in *Teal* was to foreclose proven and unrebutted *individual* claims of discrimination by looking to an employer's treatment of a *group.* Here, the issue is whether Stony Brook's neutral criteria have an adverse impact upon a group, and upholding Stony Brook's defense against plaintiffs' class action claims would not foreclose valid individual claims of discrimination, as the "bottom line" defense did in *Teal.*

The court concludes that plaintiffs have failed to establish that Stony Brook has a pattern and practice of sex discrimination in hiring its faculty.

### 2. Placement at Hire.

Plaintiffs claim that Stony Brook has discriminated against its female faculty NTP's and librarians in terms of their placement at the time they were originally hired. These claims will be discussed separately.

### (a) Faculty Placement at Hire.

On this issue plaintiffs introduced statistics to demonstrate that women with the same qualifications as men—measured in terms of age, level of education, field of degree, and total years of teaching experience—were placed in lower academic ranks. The percentage of hired male faculty initially placed as associate or full professors (26%) is consistently higher than the comparable percentage for women (13%). Conversely the percentage of hired women placed into the non-tenure track rank of lecturer (32%) was consistently higher than the comparable percentage for men (12%).

Plaintiffs introduced a multiple logit regression analysis to show that from 1972 to 1976, women as compared with men with "comparable qualifications" were initially assigned to lower faculty ranks. That method, however, is incapable of recogniz-

ing linked variables such as the normal progression of faculty ranks. Instead, it considers each faculty rank as if it were unrelated to the others, and therefore did not consider prior faculty rank or experience among the variables to be analyzed.

As a result of this defect plaintiffs' statistics, while having superficial appeal, fail to consider important and legitimate factors relevant to initial placement. For instance, their statistics would group a tenured full professor awarded a Ph.D. in 1968 with a lecturer who also received a Ph.D. in '68. Obviously the tenured full professor's teaching experience would be a relevant factor in determining rank at hire. Moreover, prior academic rank is itself a measure of academic achievement, as defendants correctly note, and most faculty candidates would be reluctant to accept a position from Stony Brook below their rank at another university.

In analyzing the same basic data defendants used an ordered logit regression analysis with control variables similar to plaintiffs' but which additionally controlled for "rank immediately prior to hire". An ordered logit analysis can consider a continuous dependent variable, such as prior rank, while a multiple logit analysis, used by plaintiffs, cannot.

The variables employed in defendants' statistics were: type of educational degree, lapsed time since receipt of highest degree, and academic rank achieved elsewhere. Their ordered logit analysis showed no statistically significant disadvantage to women faculty in initial placement. Defendants' expert testified that had their studies "omitted information on prior rank, the result would have been a finding of slight statistical significance to suggest that women were placed into lower ranks than men."

The court recognizes that in general terms it is somewhat unrealistic to even attempt an evaluation of the initial placement of faculty on a university-wide basis, because the initial placement process is not carried out on such a basis. Stony Brook has no specific criteria for initial faculty assignment. Rather, Stony Brook recruits and interviews faculty for specific positions, and each separate department evaluates an applicant according to the vacancy it seeks to fill. Academic personnel are not first hired and then assigned to rank; instead, they are interviewed and hired to fill specific teaching positions. As a result, insofar as they attempt to isolate general factors governing initial placement both plaintiffs' and defendants' statistics are unrealistic because they seek to describe a condition that does not exist. More appropriately, their statistics should be viewed as describing the backgrounds of faculty appointees within the various academic ranks, and the aggregated results of a large number of separate, uncoordinated decisions in a number of different departments.

Despite this inherent defect, both sides have sought to impose order on an intrinsically un-ordered situation, and on these attempts, the court finds that defendants' ordered logit analysis is a more accurate measure of Stony Brook's placement practices than is plaintiffs' multiple logit analysis. The statistical approach of defendants' experts on this issue provides a non-discriminatory explanation for the apparent disparity shown by plaintiffs' statistics.

The court would not approve the use of prior rank as the sole determining factor in initial placement, but Stony Brook did not use that factor exclusively here. Although plaintiffs' study shows an adverse impact on women when prior rank is excluded, and defendants' study finds no adverse impact when it is included, it does not follow that prior rank is a "neutral factor" used by Stony Brook to determine rank at hire. Statistics are predictive and descriptive tools, used here to explain hiring decisions. They are not evidence that Stony Brook used prior rank as the sole criterion to place new faculty hires. The court finds that as used by defendants' experts prior rank is merely a descriptive variable that subsumes other valid placement criteria. Defendants' studies provide a more accurate explanation of the pattern of place-

ment of new faculty at Stony Brook and are a more accurate description than plaintiffs' of what factors governed the initial placement of women at hire.

2. (b). Initial Placement of NTP's at Hire.

To establish discrimination against female NTP's in their initial placement plaintiffs demonstrated that the percentage of women NTP's holding lower PR-ranked jobs exceeds the percentage of men holding lower PR-ranked jobs. For instance, during the academic years from 1972 to 1974, Stony Brook employed—not hired—532 NTP's. Of those, 190 were women, 66% of whom held jobs in PR–1. the lowest rank. In comparison, of the 342 male NTP's, only 28% held jobs in PR–1. In the same period, of 261 NTP's hired, 120 were female and 75% of them held jobs in PR–1. Of the 141 male NTP's hired, only 47.5% of them held jobs in PR–1. Plaintiffs claim this evidence proves that Stony Brook discriminates against women NTP's in initial placement. As with the parallel claims for faculty, a central flaw in plaintiffs' case on this issue focuses on the availability pools. In this instance, however, plaintiffs failed to present any evidence whatsoever as to the availability pools for the many and varied NTP positions.

Even a cursory look at the job descriptions for the over 140 NTP positions reveals that many are jobs requiring considerable specialization. Moreover, in analyzing hiring or initial placement, it is misleading to group the different ranks of NTP's, because such a grouping automatically masks the differences in job positions and makes impossible any analysis tied to relative availabilities. Consequently, plaintiffs' statistics on the initial placement of NTP's are not helpful in determining whether Stony Brook has either hired or properly placed an appropriate number of women in the various NTP ranks.

Other evidence shows that over the relevant period Stony Brook hired increasing numbers of women in virtually every PR rank. For instance, from 1971–72 to 1976–77 the number of women NTP's more than doubled while the number of men increased

by only 5.4%. The percentages of men and women in PR ranks 1 to 3 has been steadily converging. In 1976–77 40% of Stony Brook's 547 NTP's were women as compared with 66% in 1972–74. There has been a significant increase in the number of women employed in PR1–3, and the percentage of all women NTP's employed in those ranks has decreased. Between 1971–72 and 1976–77 the number of women in PR4–8 increased from 2 to 10 while the number of males decreased from 70 to 58. The percentage of women in those ranks increased between 1971–72 and 1976–77 from 3% to 15%. From 1971 to 1977 the percentage of women increased in PR–3 from 11% to 24%, in PR–4 from 0% to 12%, in PR–5 from 9% to 16%, and in PR–6 from 0% to 33%. Of course, those percentage increases are not controlling either, because they do not take account of availability pools. However, since reliable availability pools are unavailable for almost every position in the PR ranks, the court does view this evidence of increased hiring of women at all levels as weighing adversely against plaintiffs.

Defendants' statistics showed that Stony Brook hired more than the expected number of women in each PR rank according to defendants' availability pools, which they concede are subject to criticism.

Plaintiffs offered some evidence to show that Stony Brook circumvents hiring procedures by making 90-day temporary appointments, which are not subject to formal procedures. However, defendants established that women, not men, received most of these appointments. Plaintiffs did not claim that Stony Brook hired women into 90-day temporary positions to avoid hiring them as full-time NTP's.

Plaintiffs argue that placement criteria are flexible, that placement decisions are primarily made by men, and that the criteria are manipulable, all to the disadvantage of women. The results of the discriminatory practices, plaintiffs claim, are evident in the multiple logit regression analyses in Exhibit 169–2(a), which show a highly statistically significant difference between

men and women NTP's in initial placement for NTP's hired between March 24, 1972 and February 11, 1974. Plaintiffs introduced no statistics during the liability period, "because only one female hired during that period was initially assigned to a PR level of 4 or above."

Exhibit 169-2 compared the number of women and men "assigned to PR 1-4 and PR 4-8." Plaintiffs' study concluded that during this time period women were much less likely—relative to men with "comparable" characteristics—to be assigned at hire to ranks PR 4-8. The comparability factors were the same as those used in the faculty hiring regression analyses: age, level of education, field of degree, and quality of degree, notwithstanding the widely divergent job categories encompassed in each rank and the equally divergent qualifications required for various jobs.

The court declines to draw an inference of discrimination from these statistics, first, because plaintiffs have failed to show the availability pools—the percentages of women qualified for the various positions in the 8 PR ranks—and second, because like faculty, many NTP's are recruited and hired for specific positions. Furthermore, the predictive variables plaintiffs used do not bear a close enough relationship to the probable qualifications necessary for the wide variety of NTP positions to permit a fair evaluation of the treatment of women. Plaintiffs' predictive variables simply do not satisfactorily account for the factors that are likely to affect the NTP placements. The court therefore finds such a limited comparison between men and women on this basis unpersuasive.

While the concentration of women in lower PR ranks does raise questions regarding the actual criteria used to "place" place NTP's, and serious questions about defendants' failure to hire more than one woman in PR ranks 4-8, plaintiffs have simply failed to show that the clustering was the result of discrimination against women, particularly because the PR clusterings encompass such a wide variety of jobs and qualifications.

The court accepts the views on this issue of defendants' experts, Drs. Meier and Welch, who each testified that these studies should not be the basis of an inference of discrimination in the placement of women in Stony Brook. The court agrees with Dr. Welch in particular.

I think it's a very naive description of what careers are all about, what people are about. It [plaintiffs' analysis] describes educational levels, fields of education, calendar time since birth, since hired at Stony Brook, since receipt of degree. It gives no other opportunities for individuals to distinguish themselves in any way other than by being man and woman. Then it attributes all of the distinction associated with being a woman versus a man to discrimination and I think there are just too many opportunities for other things to intervene.

2(c). Library Hiring and Initial Placement.

Plaintiffs also claim discrimination in Stony Brook's practices of hiring and initial placement of library academic work force. Non-academic library personnel are included in the NTP discussions.

Both the 1975 and 1980 AAP's show an underutilization of women in the libraries. For both AAP's the availability pool for hiring of women in the libraries was based on the number of women receiving master's degrees nationally in library science.

The president of Stony Brook acknowledged that even under the university's own definition of "deficiency" there was a statistically significant underutilization of females in the university library according to the 1975 AAP. The president dismissed this deficiency stating:

In the university library 58.3% of the professional librarians were women, whereas in the availability pool selected for comparison with this group, recipients of professional degrees in this field in 1970–71, 81.4% were women. However, in libraries men are the objects of

discrimination not women. (Exh. WWW).

Plaintiffs' argue this statement shows an insensitivity toward women.

The 1980 AAP shows that women were underutilized by two in the libraries. Based on a total library faculty of 43 and an availability pool of 63%, the predicted number of female employees was 27, whereas only 25 women or 60% actually worked in libraries.

Women in the library work force have increased substantially in numbers and in percentages. While the number of men, 18, was the same in 1968–69 and 1976–77, the number of women rose from 23 in 1968–69 to 35 in 1976–77, a rise of 52%.

In the higher library ranks, women were also employed in increasing numbers. Between 1974 and 1977 women made up between one-third and one-half of the librarians, and the nomination of another woman was pending at the time of trial. In 1960–69, there were 9 female and 13 male assistant librarians: by 1976–77 the numbers were almost reversed: 9 male and 15 female associate librarians. Although no woman has served as director of the library, women headed two of five departments in the main campus library.

In spite of the AAP's evidence of underutilization of women, the court does not find that Stony Brook has a pattern and practice of discrimination against women in the libraries. Given the large number of women employed in the library overall, the increase in both numbers and percentages of women during the liability period, and the large number of positions of responsibility held there by women, plaintiffs have failed to prove that Stony Brook discriminates against women in the library work force.

The court concludes therefore that plaintiffs have failed to establish a pattern or practice of sex discrimination in either hiring or initial placement of faculty, NTP's or librarians.

3. Promotion and Tenure of Faculty.

Plaintiffs claim that there was unlawful discrimination with respect to faculty both in promotions granted and tenure awarded. Plaintiffs present summaries and analyses of promotions and tenure awards which show that in terms of raw numbers, women were promoted and given tenure less frequently than men. Plaintiffs have assumed that all faculty members were eligible for promotion and tenure in every year, an assumption that is unrealistic in the operation of the university.

Defendants do not dispute the numbers, but challenge plaintiffs' statistical analyses, primarily on the basis of their assumptions with respect to the appropriate availability pool of faculty who were eligible for promotion or tenure during the relevant period. Defendants analyzed the promotions and tenures on the basis of the actual numbers of men and women who were considered in the relevant periods. The court finds and concludes that defendants' analysis more accurately reflects the actual promotion and tenure actions taken at Stony Brook, and that plaintiffs' evidence with respect to faculty tenure and promotion decisions does not establish a pattern or practice of unlawful sex discrimination at Stony Brook after 1972. Before reviewing this evidence in detail, we will briefly review the policies and procedures that govern faculty promotion and tenure at Stony Brook.

a) Promotion and Tenure Policies

Promotion and tenure are separate decisions that need not occur simultaneously. The formal guidelines for promotion and tenure are set out in the "Policies of the Board of Trustees" and in the procedures of the "Committee on Personnel Policy of the Faculty Senate". Although similar, the procedures for tenure and promotion are not identical.

Promotions for faculty involve a change from one rank to another. There is no fixed time for promotion because a promotion is largely a function of experience. Consequently, promotion of newly-hired faculty is rare because it takes time to determine if they merit promotion, and the university presumes they have been given a correct rank at the time of appointment.

Promotion of someone who has just been promoted is even less likely, although not impossible.

A junior faculty member—one holding the rank of assistant professor, instructor, senior assistant librarian, or assistant librarian—has seven years in which to receive tenure. Tenure decisions ordinarily are made at the end of the sixth year, a full year before the Policies of the Board of Trustees require a final tenure decision to be made. A senior faculty member—one holding the rank of professor, associate professor, librarian, or associate librarian, —has three years in which to receive tenure.

In theory, faculty members are eligible for promotion at any time, but ordinarily they are considered for promotion at regular intervals coincident with the expiration of their previous appointment. Because Stony Brook makes the vast majority of promotion and tenure decisions at these predictable intervals, plaintiffs' statistics are unrealistic insofar as they consider every faculty member to be eligible for promotion or tenure in each year.

Mastery of subject matter, effectiveness in teaching, scholarly ability, effectiveness of university service, and continued intellectual growth are the listed criteria for both promotion and tenure. Their application for promotion from associate to full professor is more stringent than for promotion from assistant professor to associate professor. Since the criteria are partially subjective, Stony Brook has instituted procedures that tend to build a consensus on the merits of each promotion or tenure decision so as to guard against possible undue influence by any particular individual.

Promotion and tenure determinations are usually initiated within each department, ordinarily by the department chairman, most of whom are men. The department chairman, or his delegate, prepares a candidacy file, which consists of biographical information prepared by the candidate, listing education and career information including honors, publications, service within and outside the university, courses taught, number of students taught, and number of dissertations supervised. Publication is an important criterion in both promotion and tenure decisions, and a candidate may list only works that are published or accepted for publication. However, where a candidate has few or no publications some departments consider manuscripts. The candidate's file also contains all supervisory and teaching evaluations, including reports of the provost, vice president for liberal studies, and the appropriate academic vice president. The candidate may review the contents of this file after the names of those faculty who make recommendations are removed.

In addition to the candidacy file, the department also prepares a special evaluative file containing confidential recommendations and evaluations, but these are not available to the candidate. The department solicits letters on the teaching, research, and service of the candidate, as well as written evaluations from at least five scholars outside Stony Brook, at least two of whom are chosen from the list submitted by the candidate. The department selects the other three, and the chairman contacts them.

The complete file is then reviewed by each member of the department who is senior to the candidate. A vote is taken and recorded. For promotion decisions, the faculty at and above the rank to which promotion is sought are qualified to vote. Only tenured faculty vote in tenure decisions. The chairman then prepares a letter which summarizes the views and recommendations of the department, and which is signed by each voting faculty member in the department. The chairman prepares a separate letter if he disagrees with the department's vote. If department members dissent, they may submit a minority report.

After this departmental action is complete, the chairman forwards the entire file and departmental recommendations to the appropriate dean or provost, who makes a separate recommendation which is added to

the file. The file is then forwarded to the Personnel Policy Committee (PPC), a standing committee of six to eight members elected by the Faculty Senate primarily to review the scholarship of candidates. The PPC also votes on the file. The College of Arts and Sciences, the College of Engineering, and the Health Sciences Center each have a separate PPC. A joint committee reviews candidates from the College of Urban and Policy Sciences.

The file is then forwarded to the academic vice president. During Academic Vice President Gelber's tenure, which spanned the entire liability period, the three university-wide deans—Dean of Graduate Studies, Dean of Undergraduate Studies, and Dean of Continuing Education—also reviewed the files.

The academic vice president forwards the file to the president, who renders the final decision on all candidates for promotion. In tenure decisions, the president makes a recommendation which he forwards to the Chancellor of the State University, who grants tenure to those faculty who, "in his judgment, are best qualified."

Plaintiffs claim that these practices and procedures have adversely affected female faculty due largely to a claimed pervasive and manipulative influence by some male department chairmen. The claimed instances of discrimination against females because they had not met publication requirements, even if true, would not establish a university-wide pattern and practice. The instances themselves, moreover, seem to involve sensitive problems of qualifications which could not in the context of this case be decisive on the central issue. The court therefore finds no class-wide pattern or practice of discrimination evidenced by the specific instances testified to by plaintiff Coser, plaintiff Miller, and Virginia Cole.

Unquestionably, subjective professional judgments enter into both promotion and tenure decisions, but the policies and procedures established at Stony Brook are designed to minimize the possibility of bias in the exercise of those judgments. Plaintiffs

have presented no evidence that the criteria themselves are inappropriate to the issues of tenure and promotion in the university context, nor have they suggested different, more objective criteria that might be used. The procedures adopted and their application at Stony Brook after 1972 are essentially fair. In particular, the wide consultation forming the base for each promotion and tenure decision makes it unlikely that systematic bias of any kind will occur.

b) Faculty Promotion.

Plaintiffs' statistics suggest a possible inference that women faculty members were disadvantaged in promotions. However, they do not show the gross statistical disparity required by *Teamsters* to establish even a prima facie case. Moreover, neither plaintiffs' nor defendants' statistics are precise enough to enable the court to make any determination on this claim with confidence, primarily because neither party introduced a convincing availability pool.

Plaintiffs introduced statistics to show that the percentage of women promoted is less than the percentage of women in the work force for each rank, while the percentage of men promoted exceeds their percentage in the work force for each rank. For instance, women comprised between 24 and 30% of the assistant professor work force from 1972 to 1977 but received 20% of the promotions to associate professor. During this time the male percentage of the assistant professor work force ranged between 76% and 70%, but men received 80% of the promotions to associate professor.

Similarly, women comprised from 8% to 12% of the associate professor work force from 1972 to 1977 but received only 6% of the promotions to full professor. Male associate professors, who comprised from 92% to 88% of the work force during the same time, received 94% of the promotions to full professor.

Plaintiffs' statistics, however, do not account for the length of time faculty had been within each rank, and they assume, unrealistically, that every faculty member

is eligible for promotion in any given year. The impact of this misplaced assumption is exaggerated by the fact that women faculty were hired in increasing numbers as the years passed, so that on the average, and at any given time, the percentage of women who would normally become eligible for promotion would be less than the percentage of women in the work force. The same fundamental defect applies to plaintiffs' analyses of the number of years to first promotion and the numbers and percentages of faculty receiving second promotions.

Defendants introduced statistics to show that among those actually considered for promotion, Stony Brook promoted women faculty in about the same percentages as men. However, defendants' statistics are defective, too, in that they failed to divide the promotional considerations by rank. Their statistics reflect only the sum of all promotions by college or division. In short, the parties have given the court statistics that do not easily compare with one another, and that point toward conflicting inferences.

The court agrees that if accepted, plaintiffs' statistics could support an inference that women faculty have been disadvantaged in terms of promotion. In view of their unrealistic premise, however, those statistics fail to establish unlawful discrimination in promotions, and they fall far short of establishing a university-wide pattern or practice of unlawful sex discrimination. On the other hand, the court finds the defendants' statistics, which purport to show how Stony Brook treated faculty women actually considered for promotion, to be substantial evidence of non-discrimination in this area.

c) Faculty Tenure.

Plaintiffs' claim of sex discrimination in tenure decisions rests primarily on the contention that Stony Brook's policies and procedures in making tenure decisions employ facially neutral criteria but disadvantage women because they are flexible and vest untoward discretion in department chairmen, who themselves discriminate against women. Functionally, tenure decisions at Stony Brook are decentralized: each one is made on a department basis, subject to ratification by higher authorities.

Plaintiffs show that in each academic rank the percentage of women awarded tenure is less than the percentage of men awarded tenure, and they claim that women receive tenure at hire less frequently than men. Defendants argue that plaintiffs' statistics are flawed, and that here as elsewhere they do not take proper account of who is eligible for tenure. Defendants also introduced evidence to show that among those actually considered for tenure, women were awarded tenure more frequently than men.

Neither party's statistics present a complete and accurate description of Stony Brook's tenure decisions, which necessarily involve complex factors and difficult qualitative judgments on the candidates' academic and intellectual competencies.

While the court was initially concerned about the apparent numerical disparities with respect to tenure within the Stony Brook work force at the professor and associate professor levels, nevertheless, after weighing all the evidence presented, the court finds that plaintiffs' evidence fails to show unlawful discrimination against women after 1972 in defendants' tenure actions.

Plaintiffs show that from 1972 to 1977 men were tenured, both in terms of numbers and percentages, more frequently than women. On the core campus in fall 1976, 96% of the male full and associate professors were tenured, while only 70% of the female full or associate professors were tenured. In the HSC, of full and associate professors, 75% of the men were tenured, but only 67% of the women were tenured.

Plaintiffs also introduced evidence to show that women (as a percentage) receive statistically significant fewer tenure awards than men. Plaintiffs' Exhibit 149–2 states that its assumed availability pool for tenure decisions includes "the sum of persons present and holding the non-ten-

ured faculty rank of assistant professor, associate professor, and professor" in the years 1972–75. That exhibit indicates that 10% of the "eligible" men were given tenure from 1972–73 to 1976–77, while at the same time only 7% of the "eligible" women received tenure. According to plaintiffs, this disparity is significant at the 5% level.

Defendants challenge these statistics on two grounds, both of which have merit. First, they claim plaintiffs used an inappropriate availability pool when preparing their statistics. Specifically, they claim plaintiffs misinterpret Exhibit 137, which lists the number of associate and full professors, on the ground that Exhibit 137 does not distinguish between tenured and non-tenured faculty. As a result, defendants claim, use of this information overstates the availability pool because it includes tenured faculty members as being eligible for tenure.

Defendant's second objection is that plaintiff's availability pool fails to consider the number of years each faculty member has held a given rank, and therefore improperly considers that every faculty member is eligible for tenure every year. The court found *supra* that ordinarily faculty receive serious consideration for tenure only at expected intervals—in their fifth or sixth year of teaching for junior faculty, and in their third year for senior faculty.

It is unrealistic to assume that except in unusual circumstances most academic departments would consider assistant or associate professors for tenure before they had acquired the appropriate teaching experience. Consequently, as indicated above, the court declines to accept plaintiffs' evidence as proof of unlawful discrimination, because plaintiffs have failed to account for years of service in each faculty rank, and therefore, misstate the proper availability pool.

Defendants present their own analysis of the tenure grants. As indicated earlier, however, this analysis is not entirely satisfactory either, because it does not address many of the qualitative judgments that enter into tenure decisions. Nor does it break down the tenure grants by rank. Nevertheless, defendants' analysis is superior to plaintiffs', because it focuses more realistically, although not flawlessly, on the availability pool. Accepting the assumption that in the usual case tenure is given serious consideration for the first time in about the fifth year, defendants point out that 66% of the eligible women were granted tenure between 1972 and 1977 while only 52% of the eligible men were granted tenure in the same period. This picture more accurately reflects Stony Brook's non-discriminatory actions on tenure than the more convoluted presentations of plaintiffs, based on their unrealistic assumptions as to eligibility.

Plaintiffs' second claim on tenure is that Stony Brook unlawfully discriminates against women in awarding tenure at hire. Hires with tenure are a special group of employment decisions at Stony Brook in that they involve only people who are hired in the two senior ranks. Usually they involve people who held prior tenure in a similar position at another university. Each such appointment is subject to affirmative action review and to review by the PPC.

Plaintiffs point out that among those who lacked prior tenure a significantly greater number of men than women were granted tenure when hired directly into the ranks of full and associate professor. They also point out that among those who were hired as full and associate professor, a significantly larger number of men than women lacked prior tenure. Plaintiffs argue that defendants have "increasingly emphasized prior tenure" as a determinator of tenure at hire and that this facially neutral selection criterion has a disparate impact that disproportionately disadvantages women.

Defendants showed that overall, women were awarded tenure in roughly equal percentages to men, that women faculty hired by Stony Brook without previous tenure were more likely to receive tenure at hire than were men hired without previous tenure and that a larger percentage of women

without prior tenure were awarded tenure at hire than men.

Plaintiffs argue that defendants misinterpret their claim of discrimination. The heart of plaintiffs' claim is that the use of prior tenure itself is a criterion that disadvantages women because the other institutions from which prospective faculty came also discriminated against women in granting tenure.

The court does not accept plaintiffs' theory as applied to the period in question. Much of the claimed discrimination in tenure against women at other institutions was lawful, just as pre-1972 discrimination at Stony Brook would have been lawful. Moreover, tenure cannot be viewed as plaintiffs would have it, as merely a substitute for other "actual qualifications of prospective faculty members". Tenure itself has both status and significance in the academic community. One of its most obvious consequences is its effect on the bargaining process between the prospective employee-professor and the prospective employer-university. As defendants point out, it would be both naive and unreasonable to expect a person with tenure to accept the new position without tenure. The court therefore rejects plaintiffs' argument that the defendants could not properly consider prior tenure in determining whether to award senior faculty tenure at hire.

While the court is disturbed by the obvious disparity between the gross percentages of male and female tenured faculty, plaintiffs have simply failed to prove that this stratification is the result of unlawful discrimination by Stony Brook during the liability period. Plaintiffs' unrealistic assumption as to eligibility renders their statistics unreliable. The court need not speculate as to results of statistics using an availability pool comprised only of fifth or sixth year faculty, since defendant's statistics presumably approximate that test. Since the court is unpersuaded by plaintiffs proof, and since defendants' statistics tend to that Stony Brook did not discriminate against women, the court concludes based on these statistics and the other evidence that plaintiffs have not proven that Stony Brook has a pattern or practice of unlawful discrimination against women faculty in awarding tenure.

4. Promotion of NTP's.

a) NTP Promotion Policies.

The "policies of the Board of Trustees" govern promotion for NTP's. That document defines an NTP promotion as an increase in a professional employee's basic annual salary without a change in title by movement within rank or to a higher rank, or with a change in title by movement within rank or to a higher rank. For many NTP positions there are no "links", no promotion ladders. Consequently, most NTP promotions involve only an increase in salary within a grade, and without a change in PR rank.

The policies of the Board of Trustees identify the following as among the criteria for promotion of NTP's:

(a) effectiveness in performance,

(b) mastery of specialization,

(c) professional ability,

(d) effectiveness in university service, and

(e) professional growth.

Normally an employee or the employee's supervisor initiates the promotion process, primarily because of an increase in the employee's responsibilities. The procedure for promotion varies according to the position held in the university; most of the promotions in the lower PR ranks are made by the employee's supervisor with the approval of the president. SUNY Central must approve the promotion decision for higher-level NTP promotions.

Denials of NTP promotions are heard by the Promotion Review Panel, established in 1973. Originally the panel reviewed complaints arising from changes in classification from an old NTP ranking system to the current system. It now hears appeals from denials of promotions, although this procedure is rarely invoked. The president retains authority to overrule a recommendation of the panel.

Plaintiffs claim that these procedures, like those for hiring and continued employment, involve primarily subjective decisions by men who manipulate these procedures to the disadvantage of women, but this contention is in part undercut by the participation of women in the promotion process. Two of the seven members of the promotion review panel established in 1973 were women. The newly elected panel in 1978 consisted of five women and two men. Despite the preponderance of women no promotion appeals were taken to the new panel.

Nor have those NTP supervisors and university officials who were responsible for promotion decisions affecting NTP's always been male. Since 1974 the director of personnel who supervises 31 NTP's was female. Several other supervisors of NTP's were also female during the relevant period. Nor does the evidence establish that male supervisors inevitably place female NTP's at a disadvantage in promotion.

b) Promotions of NTP's.

Plaintiffs show that from 1972 to 1977, 66 NTP's were promoted from PR–1 to PR–2, and 54 were promoted from PR–1 to PR–3 or above. Of the women so promoted, 64% were promoted to PR–2, and 36% were promoted to PR–3 or above. In comparison, of the men promoted, 51% were promoted to PR–2, 49% were promoted to PR–3 or above. These statistics, however, include only rank-to-rank promotions and do not include either Stony Brook NTP's hired in a publicized search to fill unlinked NTP positions, or salary promotions within rank.

Defendants introduced no separate statistical analysis to show that Stony Brook's promotional practices are non-discriminatory, but instead relied on a number of perceived defects in plaintiffs' statistics. Defendants correctly point out that in their analysis of NTP promotions plaintiffs use an improper and misleading availability pool, that plaintiffs' statistics do not consider the position, qualifications for that position, or the length of service of men

and women in particular positions, and that plaintiffs' statistics overlook most of the promotion actions affecting NTP's in PR–1 because most promotions involve only a salary increase without a change in job description or PR rank.

Plaintiffs' statistics misleadingly aggregate under the headings PR–1 and PR–2 widely divergent qualifications and skills, and erroneously assume that every employee in PR–1 is eligible for promotion to PR–2. The clear weight of the evidence indicates that PR rankings are primarily salary groupings and encompass a wide range of NTP positions. In short, plaintiffs' selective statistical presentation is insufficient for them to prevail on this aspect of their claim.

Plaintiffs presented no evidence to show discrimination against women with respect to permanent employment and therefore have abandoned this aspect of the claim.

In sum, plaintiffs have failed to carry their burden of establishing a university-wide pattern or practice of unlawful sex discrimination with respect to promotion or tenure of NTP's.

E. Salary.

Plaintiffs claim that defendants have discriminated against women faculty and NTP's in the salaries paid to them. With respect to both faculty and NTP salaries, a few preliminary observations about the use of statistical analysis are appropriate.

At Stony Brook both faculty and NTP's are specially talented individuals suited by training and experience to particular positions within the university. Consequently, it is misleading to view them as a single labor pool whose members are interchangeable. Employment decisions that affect a population of such individuals necessarily and properly require the exercise of individualized professional judgments. Many of the decisions complained of by plaintiffs in this action were joined in, reviewed, and passed upon without comment or objection by several of the named plaintiffs. Selecting, promoting, and compensating personnel at the university level requires delicate

professional judgments involving many elements that are unquantifiable, for example mastery of subject matter, mastery of area of specialization, teaching ability, quality of scholarship, and motivation.

In this context, statistical analysis has limited usefulness and any use of statistics to evaluate such complex employment decisions must be examined carefully. Of some help in the process is the technique of multiple linear regression analysis. Its utility and validity in a particular instance, however, depend upon careful selection of appropriate independent variables. Of particular significance here, and explanatory of much of the difference between plaintiffs' and defendants' experts is plaintiffs' omission of any variable to account for prior experience. Plaintiffs sought to justify that omission on the ground that to recognize it would merely perpetuate the effects of sex discrimination that originally occurred elsewhere. However, as defendants correctly point out, in this action it is only the defendants' neutrality which is at issue, not the world's.

The need for a homogeneous population for adequate statistical analysis makes suspect plaintiffs' unnecessary aggregating of individuals from different departments and different disciplines. On the whole, defendants' statistics focused more closely on the particular circumstances affecting Stony Brook and more accurately analyzed and weighed the impact of sex as a variable in the critical salary decisions.

1. Faculty Salary.

After carefully reviewing all of the evidence presented regarding Stony Brook's salary policies and statistical evidence of alleged discrimination with respect to the salaries of men and women, the court finds and concludes that plaintiffs have failed to prove that Stony Brook has a pattern and practice of discrimination against women with respect to faculty salaries. Plaintiffs' evidence is rife with methodological and analytical flaws, and therefore is not credible. In particular, plaintiffs improperly aggregated various disciplines within the faculty, ignored critical factors in the salary decisions, and failed to consider "comparable" men and women. While the court does not entirely accept defendants' statistics, they do tend to corroborate the court's finding and rebut any inference that otherwise might be available from plaintiffs' statistics.

a) Faculty Salary Policy.

None of Stony Brook's salary policies is facially discriminatory. A new faculty member's salary is normally negotiated between the faculty appointee and the department chairman, based loosely on factors such as the education, qualifications, and experience of the new appointee, the salary scale in the appointee's discipline, the rank of the appointment, salary of comparable employees, and the salaries of peers at other education institutions in the same field. Faculty members in economics, mathematics, and the physical sciences normally command higher salaries than those in the humanities or nursing.

Final approval of a salary determination is made by a university official such as a dean, provost, or academic vice president. The appointee frequently will negotiate salary directly with these officials. The president approves salaries below $24,000, but the chancellor must approve the appointment of any person with a starting salary above that amount.

Salary increases usually take the forms of across-the-board percentage increases, and discretionary or merit increases. Merit increases usually are given for increased administrative responsibilities such as a department chairmanship, or for promotion or tenure. Department chairmen have primary responsibility for awarding non-mandatory salary increases and make merit increases based on an evaluation of a faculty member's specialization, rank, publications and written performance evaluations. The department chairman must support each adjustment by evidence, and SUNY Central must approve each adjustment.

The faculty union negotiates percentage increases through the collective bargaining process. Merit increases are also usually

awarded as percentages of existing salary rather than by fixed amount. Consequently, to the extent that women's salaries are lower than men's, for each percentage increase, men receive more in actual dollars than women.

There is a wide salary range within each academic rank, particularly from discipline to discipline. Academic personnel are classified as "academic year" (ten-month) or calendar year (12-month) appointments. Calendar year appointees are given either "12-month strict" or "12-month regular" appointments. Only clinicians with an M.D. or a D.D.S. degree who are working in the medical or dental schools receive "strict" appointments. For example, during the academic year 1977–78, the maximum salary for a full professor with a twelve-month regular appointment was $44,174 compared with a maximum of $62,-625 for a professor with a twelve-month strict full-time appointment. The comparable range for assistant professors was $51,-442 (strict full-time) and $25,610 (twelve-month regular).

There are standard salary increases for promotions. An assistant professor promoted to associate professor normally receives $1,000 to $1,500; an associate professor promoted to full professor receives $1,500 to $2,000. In unusual circumstances, for instance when a person receives a competing offer from another institution, these increases may be higher.

In addition, discretionary increases often correct individual inequities. For instance, after the president's AEOC in August 1973 found salary differentials between men and women at Stony Brook, the Salary Equity Task Force (SETF), appointed by the president in 1974, recommended that Stony Brook undertake a full investigation of salary differentials. As a result some faculty received discretionary increases. Defendants view the SETF inquiry and resulting increases for women as evidence of Stony Brook's attempts to avoid discrimination against women.

b) Statistical Evidence of Salary Discrimination.

The report of plaintiffs' experts, Killingsworth and Abowd, was plaintiffs' primary evidence that defendants discriminate against women with respect to salary. The Killingsworth/Abowd study was first prepared in June, 1980. After defendants' experts discovered several errors in the data base and in the conclusions of plaintiffs' experts, the report was recalled, and submitted again in October 1981. However, the experts again revised their report in the midst of trial, replacing its first 18 pages. That re-revised report now stands as plaintiffs' primary statistical evidence on this aspect of the claim, and the court considers only the figures in the final report. Dr. Killingsworth also submitted a March 1982 Rebuttal Report which clarifies the October 1981 report and restates many of its earlier conclusions, and in addition criticizes defendants' experts' report.

Plaintiffs introduced regression-derived analyses which purported to demonstrate the correlation between gender and salary not attributable to "productivity-related" variables such as age, years of Stony Brook experience, educational attainment as measured by each degree received (or the highest degree received), quality of degrees received as measured by a "quality rating" of the institution granting the degree, field of degree(s), and time elapsed since completion of each degree or highest degree. The Killingsworth/Abowd report claims that the discrepancy in pay "between all comparable full-time professional employees (faculty and NTP's) present at Stony Brook in 1976–77" is between $3,024 and $3,180, to the disadvantage of females and that this result is "highly statistically significant at the .0001 level or less". Plaintiffs did not state what margin of error was involved.

Considering all full-time faculty on staff, plaintiffs' statistics show that women are disadvantaged in terms of salary in each academic year from 1971–72 to 1976–77. Plaintiffs' report claims the results are all highly statistically significant at the .001

level or less, but again, do not indicate the margin of error. Plaintiffs further show that the discrepancies in pay between full-time male and female faculty at Stony Brook in 1976–77 are statistically significant at the .0006 and .0013 levels to the disadvantage of women. These figures also do not include a margin of error.

The Killingsworth/Abowd study excluded from their regressions what they called "employer-related variables" such as current ranking, educational achievements subsequent to hire, and publications subsequent to hire. Plaintiffs' experts acknowledged that including these variables would have reduced the indicated correlation between gender and salary, but they declined to do so because they claimed these factors are attributable solely to the allegedly discriminatory practices of Stony Brook. Plaintiffs argue that if these variables were included in the regression analyses the employer's own illegal and discriminatory acts would reduce the correlation adverse to women between sex and salary. Although information on these additional variables was available, plaintiffs decided not to perform their regression analyses with them.

Dr. Killingsworth's assumption that the division in which a faculty member works is an employer-related variable has no foundation in fact at Stony Brook. The evidence showed that both faculty and NTP's apply for specific positions which are posted and advertised, and that applications are received and considered by the department or office which is recruiting. A prospective faculty member is typically suited by training and experience to only one type of position. The same is true for upper level NTP positions and for some technical jobs in the lower NTP ranks. In short, Stony Brook does not hire people with fungible qualifications and then assign them to an appropriate task; rather, it hires particular people for particular available positions, and the division in which they work is a relevant factor in analyzing salary differentials.

Of course, at this point in this decision the court has already found that plaintiffs have failed to prove that Stony Brook has a pattern or practice of unlawful discrimination with respect to placement, hiring, and tenure of women. In that light, the court could view plaintiffs' rejection of the "employer-related variables" as improper because it was based upon a false assumption of discrimination in other aspects of employment conditions at Stony Brook. Nevertheless, the court will assume for the sake of argument that plaintiffs properly excluded these variables in conducting their regression analyses. Even with that assumption, however, plaintiffs statistical case has fatal defects.

One of the primary methodological deficiencies is the treatment of the "field of degree" variable by plaintiffs' experts in the regression analysis. Dr. Killingsworth used "field of degree" rather than "academic division" to take into account differences in disciplines. He did not use a separate indicator for each field, but aggregated the degree fields, of which there were several hundred, into general categories such as humanities.

Dr. Killingsworth did not attempt to validate this aggregation, nor was he consistent in his approach to the method of aggregating. In the June 1980 report he used approximately 31 aggregations. In the October 1981 report he reduced the number to 6. Finally, in the March 1982 report, he used approximately 18 aggregations. Even there, however, because field of degree information was missing entirely for 18% of the faculty population, he grouped that 18% arbitrarily into a single category as if they had the same field of degree.

Dr. Killingsworth analyzed salary differentials in 1976–77 and found the differential for all full-time faculty in that year to be "highly statistically significant". The impact of this finding is undermined not only by the unrealistic aggregations employed, discussed earlier, but also by including in the analysis visiting faculty, whose presence at the institution was ordinarily limited to a single year, as well as

lecturers, even though less than half of them could fairly be regarded as regular faculty.

He also analyzed the differentials in the same year for full-time faculty hired after 1974 and those hired after 1972, but neither analysis found differences that were statistically significant.

The persuasiveness of plaintiffs' analyses was further undermined by their failure to recognize the distorting effects of the unique situation in the medical school and the aberrational circumstances of a number of faculty members who were artists and performers. The education department was also worthy of special consideration because it had to been "retrenched" the previous year, but plaintiffs' experts considered them, along with medical faculty, artists, and performers, all in the same general manner.

Given all these defects in plaintiffs' studies, the court is simply unpersuaded by the exhibits and testimony of plaintiffs' experts that Stony Brook has a university-wide pattern or practice of discrimination against women in faculty salary levels. The analysis by defendants' experts shows there is sound ground for skepticism about plaintiffs' statistics. It is uncontested that there is no evidence of sex discrimination in the initial salaries of faculty hired during the liability period, that is after February 11, 1974. Dr. Welch's analysis demonstrates convincingly that no such discrimination occurred. Dr. Meier's analysis demonstrates that there has been no discrimination in rates of increase in salaries of women faculty. With respect to salary levels themselves Dr. Meier's regression analyses, which included variables for pre-Stony Brook rank, tenure, and position, as well as separate treatment for each of the divisions or schools at Stony Brook, presented a far more convincing picture of salary payments at Stony Brook than did the Killingsworth-Abowd studies, and the court accepts Dr. Meiers' opinion that there was no discrimination in salaries based on sex.

One of the major differences between Dr. Meier's study and Dr. Killingsworth's was Dr. Meier's recognition of prior position, tenure, and rank as relevant factors in the regression analyses. When those elements are included, the inference of discrimination based on sex that plaintiffs seek to draw from their limited statistical analyses, virtually disappears.

Based on all the evidence, the court finds and concludes that there was no university-wide pattern or practice of unlawful salary discrimination against faculty women at Stony Brook. Dr. Meier's study did highlight, however, a special problem in the school of medicine where there appears to be an extreme disparity in the salaries of men and women. A closer examination of the individual cases involved there attributed most of the difference to the fact that the men predominantly occupied clinical positions and possessed M.D. degrees, while the women did not have clinical responsibility, occupied mainly research positions, and most of them lacked the M.D. degree. Further study would be required to determine whether there were individual instances of discrimination in the school of medicine. Whatever the results of that study, however, they would not alter the court's conclusion that plaintiffs have failed to prove a pattern or practice of unlawful discrimination against faculty women in salaries at Stony Brook.

2. NTP Salaries.

Plaintiffs also claim sex discrimination in the salaries paid to female NTP's.

a) NTP Salary Policy.

Each NTP position has an established salary range, and each job description is placed into one of eight PR ranks. Like faculty salaries, NTP salaries are subject to percentage across-the-board increases, and discretionary increases for permanent employment or for promotion. As with faculty salaries, the vast majority of Stony Brook officials responsible for determining NTP salaries are male.

b) Statistical Evidence of NTP Salary Discrimination.

Plaintiffs introduced two separate studies in support of their claim that Stony Brook discriminates against women NTP's with respect to salary. Plaintiffs show that within each PR rank, the average salary for women is less than the average salary for men. The discrepancy varies between $926.06 in PR–1 and $3,100.10 in PR–3.

Plaintiffs' primary proof on this claim was a regression analysis prepared by Drs. Killingsworth and Abowd, which plaintiffs claim proves there were sex-related differences in salaries paid to NTP's at Stony Brook in 1976–77. These analyses used the same variables as plaintiffs used in the faculty salary study, *supra,* and concluded that the discrepancy in pay between comparable full-time NTP's present at Stony Brook in 1976–77 is between $3,402 and $3,318 to the disadvantage of women. Plaintiffs claim similar disparities for NTP's hired after 1972 and after 1974, and that the results are statistically significant at the .02 level or less. Plaintiffs again deliberately excluded what they term "employer-biased" variables, such as existing PR rank, because "the weight for sex in the salary regressions would have little practical meaning," since this effect will be "factored out" or held constant in arriving at the weight for sex in the regression period.

The court finds that plaintiffs' summary statistics fail to support an inference that Stony Brook discriminates against women NTP's in terms of salary. Plaintiffs failed to include in their regression analyses the allegedly employer-biased variable "existing-rank" or prior work experience. As defendants' experts Welch and Lillard note:

> "there is no room in [their] list [of variables] to permit differences in productivity between persons of the same age who attended the same school, receive the same degree at the same time and were employed at Stony Brook in the same year."

It is both unrealistic and illogical to look at all NTP's in terms of plaintiffs' limited variables, disregarding both prior work experiences and existing duties, and then infer that the salary differentials at Stony Brook are the result of sex discrimination. Since the variables used in the plaintiffs' regression analyses are not sufficient to realistically predict salaries, plaintiffs' statistics do not establish discrimination against NTP's in salary.

3. Under-valuation of the School of Nursing.

Plaintiffs claim that the School of Nursing is "undervalued" in comparison with the School of Allied Health Professions with respect to salaries and the rankings of women. Plaintiffs claim that Stony Brook undervalues the School of Nursing because it is a traditionally female department. Specifically, plaintiffs argue that Stony Brook underpays its nursing faculty and has promoted fewer nurses to higher ranks solely because the School of Nursing is overwhelmingly female. Aside from the legal questions presented by this claim, the court finds that the plaintiffs' proof is inadequate to establish discrimination on this theory.

The schools of Nursing and Allied Health Professions each offer four-year undergraduate degrees. The School of Nursing also offers a master's degree. Both schools require that students spend two years in a liberal arts discipline in the Core Campus. A few introductory courses are co-taught between these two schools. The School of Allied Health Professions teaches subjects other than those taught in medicine, nursing, social welfare, or dental medicine. The primary subject areas taught in Allied Health are cardio-pulmonary sciences, medical technology, physical therapy, respiratory therapy, and physician's associate education. Each of these subjects has special state or professional licensing requirements.

Virtually all (85% to 100%) of the nursing faculty between 1972 and 1977 were women. Most of the faculty in the School of Allied Health Professions are male—from a

high of over 90% in 1972–73 to a low of 69% in 1974–75. No woman has been a full professor in the School of Allied Health Professions, and only one woman has ever been an associate professor. The School of Nursing had no full professor until 1977, when the present dean of the school became its first full professor. The percentage of associate professors in the School of Nursing was roughly 14% from 1972 to 1976. The percentage of associate professors in the School of Allied Health Professions increased from 27% to 35% during that same time period.

Plaintiffs' primary claim of discrimination in this area rests on the facts that the average salary in the School of Nursing—which is overwhelmingly female—was from $4,290 to $2,704 less than the average salary in the School of Allied Health Professions, and that the average salary for women in the School of Allied Health Professions is lower than the average salary of men.

Without discussing in detail the merits of plaintiffs "undervaluation claim," the court finds that taken alone plaintiffs' statistics do not raise an inference of discrimination. While plaintiffs' evidence has some superficial appeal, nevertheless their salary averages are unadjusted for even the predictor variables introduced by plaintiffs in their other salary studies. Moreover, defendants introduced evidence to show that when plaintiffs statistics were evaluated with predictor variables such as length of service, years of Stony Brook service, years since previous degree, educational background and tenure,

> "the estimated difference [between nursing and Allied Health] and the estimated difference attributable to sex is less than two standard errors. Defendants therefore urge that there is no statistically supportable evidence of systematic differences in pay for nurses ⁙ ⁙ ⁙ ".

The court credits defendants' statistics and therefore finds that whatever inference might be raised by plaintiffs' statistics is successfully rebutted by the defendants.

Plaintiffs' non-statistical evidence—that the dean of Nursing is ranked PR–5 while the dean of the School of Allied Health Professions is ranked PR–6—is not sufficiently supportive of plaintiffs' claim, given that the two deans were paid exactly the same amount at the time the dean of the nursing school left the university. The court declines to infer anything from defendants' failure to introduce studies comparing nursing salaries at Stony Brook with other nursing schools.

The court rejects plaintiffs' contention and agrees with Dean McTernan that neither the curriculum nor the faculties of the School of Nursing and the School of Allied Health Professions are comparable for purposes of setting salaries. There is some, but very little interdisciplinary teaching. The disciplines taught at Allied Health are highly spcialized and must be taught by faculty members who are highly skilled in each particular area.

Allied Health and Nursing are discrete institutions teaching discrete specialties, and are not appropriate for direct salary comparisons. The court accepts Dr. Meier's study which demonstrated no systematic salary difference either between men and women in Allied Health alone, or between Allied Health and Nursing. Dr. Meier noted that all of the estimated effects are smaller than their standard errors and are nowhere in the range of potential statistical significance. Plaintiffs' numerical chart, showing different salary distributions by PR ranks, is insufficient without appropriate statistical analysis to establish even a prima facie case of unlawful sex discrimination against women in the Allied Health and Nursing schools.

## III. SUMMARY AND CONCLUSION

The only issue determined by this trial is whether Stony Brook had a university-wide pattern and practice of sex discrimination with respect to hiring, initial placement, promotion, granting tenure, and fixing salaries of faculty and non-teaching professionals. Based on all the evidence the court finds that plaintiffs have failed to meet their burden of proof and concludes

that for purposes of this action there is no university-wide pattern or practice of unlawful sex discrimination at Stony Brook since February of 1972. Whatever the conditions may have been prior to February of 1972 with respect to discrimination, it would not have been unlawful because Title VII did not become effective against Stony Brook until that time.

The court's determination of the pattern and practice issue adversely to plaintiffs requires dismissal of the class action aspects of this case, which would leave for further disposition the claims of the individual plaintiffs. Each of those claims involves separate facts and circumstances which may have to be addressed in separate hearings, a problem that would have been greatly simplified, if not eliminated entirely, had plaintiffs succeeded on their pattern and practice class action claim. Even now, final determination of these individual claims will be greatly facilitated if the class determination that there is no pattern or practice of unlawful sex discrimination can be reviewed on appeal immediately rather than waiting until final judgment on the many individual claims. Accordingly, the court expressly determines pursuant to FRCP 54(b) that there is no just reason for delay in entering a separate final judgment in favor of defendants dismissing the complaint insofar as it seeks relief for the class. The clerk is directed to enter judgment dismissing that part of the complaint that seeks relief on behalf of the class on the ground that the court has determined that there was no pattern or practice of sex discrimination at Stony Brook during the liability period.

Counsel shall attend a conference with the court on September 13th, at 9:30 A.M. to consider what further steps may be necessary in this action to resolve the individual claims. If, however, plaintiffs appeal the judgment to be entered dismissing the class aspects of this suit, the conference will be adjourned pending the outcome of the appeal.

SO ORDERED.